EXHIBIT B

MEZZANINE LOAN AGREEMENT

Dated as of June 28, 2005

by and between

MILLENIA LUXURY CONDOMINIUMS MEZZ, LLC
(as Mezzanine Borrower)

and

HUDSON REALTY CAPITAL FUND III LP
(as Mezzanine Lender)

NYC01_84033442_7_334016_00003 6/28/2005 3:59 PM

Case 1:07-cv-03614-RPP   Document 14-5   Filed 11/30/2007   Page 3 of 20

## TABLE OF CONTENTS

Page

ARTICLE I CERTAIN DEFINITIONS ............................................................................................2
    Section 1.1. Definitions ........................................................................................................2
    Section 1.2. Definitional Matters ........................................................................................15

ARTICLE II TERMS OF MEZZANINE LOAN .........................................................................15
    Section 2.1. Mezzanine Loan .............................................................................................15
    Section 2.2. Use of Proceeds .............................................................................................16
    Section 2.3. Mezzanine Loan Documents; Security for Mezzanine Loan .......................16
    Section 2.4. Interest ............................................................................................................16
    Section 2.5. Prepayment ....................................................................................................17
    Section 2.6. Late Charges ..................................................................................................18
    Section 2.7. Application of Payments ...............................................................................18
    Section 2.8. Maturity .........................................................................................................18
    Section 2.9. Required Payments .......................................................................................19
    Section 2.10. Tax and Insurance Impound Account .........................................................20
    Section 2.11. Payment of Supplemental Payment ............................................................21
    Section 2.12. Security Interest ...........................................................................................21
    Section 2.13. Increased Costs; Taxes; Capital Adequacy ................................................22
    Section 2.14. Cash Management .......................................................................................25
    Section 2.15. Taxes ............................................................................................................29
    Section 2.16. Reserve for Documentary Stamp Tax and Intangibles Tax .......................29
    Section 2.17. Servicing ......................................................................................................29

ARTICLE III CONDITIONS PRECEDENT .................................................................................30
    Section 3.1. Mezzanine Loan Documents ........................................................................30
    Section 3.2. Closing Costs .................................................................................................31
    Section 3.3. Senior Loan Closing; LTV Condition; Minimum Borrower Equity ...........31
    Section 3.4. Title ................................................................................................................31
    Section 3.5. Survey ............................................................................................................31
    Section 3.6. Required Insurance .......................................................................................32
    Section 3.7. Authorizations ...............................................................................................32
    Section 3.8. Material Adverse Effect ................................................................................32
    Section 3.9. Project Verification ........................................................................................32

ARTICLE IV REPRESENTATIONS AND WARRANTIES .......................................................32
    Section 4.1. Representations and Warranties of Mezzanine Borrower ...........................32
    Section 4.2. Survival of Representations and Warranties ...............................................37

ARTICLE V COVENANTS ............................................................................................................37
    Section 5.1. Mezzanine Borrower Covenants ..................................................................37
    Section 5.2. Further Assurances ........................................................................................42

Section 5.3.   Insurance..................................................................................................43
Section 5.4.   Casualty...................................................................................................45
Section 5.5.   Environmental........................................................................................47
Section 5.6.   Environmental Indemnification..............................................................50
Section 5.7.   Condemnation.........................................................................................51

ARTICLE VI REPORTING AND OTHER AGREEMENTS..............................................52

Section 6.1.   Financial Reporting................................................................................52
Section 6.2.   Budget....................................................................................................53
Section 6.3.   Management, Etc....................................................................................54
Section 6.4.   Refinancing/Transfer..............................................................................55
Section 6.5.   Leasing...................................................................................................56
Section 6.6.   Additional Consent Matters...................................................................56
Section 6.7.   Mezzanine Lender's Expenses...............................................................56
Section 6.8.   Senior and Mezzanine Lender Notices..................................................57

ARTICLE VII DEFAULTS.....................................................................................................57

Section 7.1.   Event of Default.....................................................................................57
Section 7.2.   Remedies................................................................................................59

ARTICLE VIII MISCELLANEOUS.......................................................................................61

Section 8.1.   Interest Rate Limitation..........................................................................61
Section 8.2.   Entire Agreement...................................................................................62
Section 8.3.   Closing...................................................................................................62
Section 8.4.   Governing Law; Service of Process; Waivers......................................62
Section 8.5.   Modification, Waiver in Writing...........................................................64
Section 8.6.   Delay Not a Waiver...............................................................................64
Section 8.7.   Notices...................................................................................................64
Section 8.8.   Waiver of Jury Trial...............................................................................65
Section 8.9.   Assignment............................................................................................65
Section 8.10.  Severability............................................................................................66
Section 8.11.  Joint and Several...................................................................................66
Section 8.12.  Headings; Counterparts.........................................................................66
Section 8.13.  No Joint Venture or Partnership............................................................66
Section 8.14.  Waiver of Counterclaim........................................................................66
Section 8.15.  Conflict; Construction of Documents...................................................66
Section 8.16.  Dissemination of Information; Cooperation; Estoppel.........................67
Section 8.17.  Indemnification......................................................................................67
Section 8.18.  Recourse.................................................................................................68
Section 8.19.  Compliance with Anti-Terrorism, Embargo and Anti-Money Laundering Laws...71
Section 8.20.  Conversion Event..................................................................................71
Section 8.21.  Senior Loan............................................................................................72
Section 8.22.  Rescission of Payments.........................................................................76
Section 8.23.  Bankruptcy.............................................................................................76
Section 8.24.  Sole Discretion of Mezzanine Lender...................................................77
Section 8.25.  Reasonableness......................................................................................77
Section 8.26.  Absolute and Unconditional Obligation................................................77

Section 8.27. Waiver of Statutory Rights..................................................................................77
ARTICLE IX CONDOMINIUM PROVISIONS ...................................................................78
Section 9.1. Condominium Conversion of the Property.........................................................78
Section 9.2. Sales of Units......................................................................................................80

EXHIBIT A      Initial Budget
EXHIBIT B      Structural Chart of Mortgage Borrower and Mezzanine Borrower
EXHIBIT C      List of All Senior Loan Documents
EXHIBIT D      Condominium Benchmarks
EXHIBIT E      Minimum Release Consideration

## MEZZANINE LOAN AGREEMENT

THIS MEZZANINE LOAN AGREEMENT (as the same may hereafter be modified, amended, or supplemented from time to time, this "Agreement"), made as of June 28, 2005, is by and between **HUDSON REALTY CAPITAL FUND III LP**, a Delaware limited partnership, having an office at c/o Hudson Realty Capital LLC, 381 Park Avenue, Suite 428, New York, New York 10016 (together with its successors, assigns and/or participants, "Mezzanine Lender"), and **MILLENIA LUXURY CONDOMINIUMS MEZZ, LLC**, a Delaware limited liability company, having an address at 2601 South Bayshore Drive, Suite 200, Miami, Florida 33133 (Mezzanine Borrower").

### RECITALS

A.  Mezzanine Lender has agreed to make a mezzanine loan (the "Mezzanine Loan") in the principal amount of Thirteen Million Four Hundred Thousand and No/100 Dollars ($13,400,000.00) (the "Mezzanine Loan Amount") to Mezzanine Borrower, which owns 100% of the equity interests in Millenia Luxury Condominiums, LLC, a Delaware limited liability company ("Mortgage Borrower");

B.  In connection with the Mezzanine Loan, Fremont Investment & Loan, a California industrial bank ("Senior Lender") will make a loan in the maximum principal amount of up to Sixty-Nine Million Seven Hundred Fifty Thousand and No/100 ($69,750,000.00) (the "Senior Loan") to Mortgage Borrower. The Senior Loan will be evidenced or secured by, inter alia, a first mortgage, deed of trust or deed to secure debt (as amended, modified and in effect from time to time, the "Senior Mortgage") on that certain parcel of real property owned by Mortgage Borrower located at 3573 Conroy Road, Orlando, Florida, and more particularly described in the Senior Loan Documents, and the buildings and improvements located thereon (the "Property");

C.  The Mezzanine Loan will be evidenced and secured by, among other things, a Pledge and Security Agreement dated as of the date hereof between Mezzanine Lender and Mezzanine Borrower, whereby Mezzanine Borrower will pledge to Mezzanine Lender, Mezzanine Borrower's 100% equity interest in Mortgage Borrower (the "Pledge Agreement"), together with certain other collateral, to secure Mezzanine Borrower's obligations under the Mezzanine Loan Documents (defined below).

D.  Mezzanine Lender is willing to make the Mezzanine Loan on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Mezzanine Borrower and Mezzanine Lender, intending to be legally bound, agree as follows:

## ARTICLE I

### CERTAIN DEFINITIONS

Section 1.1.   <u>Definitions</u>.  As used in this Agreement, each of the following capitalized terms has the meaning ascribed to it below:

"<u>Accrual Period</u>" shall mean with respect to any Due Date, the calendar month preceding such Due Date, <u>provided</u> that no Accrual Period shall end later than the Maturity Date (other than for purposes of calculating interest at the Default Rate), and the initial Accrual Period shall begin on the Effective Date.

"<u>Additional Appreciation Interest</u>" shall have the meaning set forth in <u>Section 10.1.1</u> hereof.

"<u>Affiliate</u>" of any specified Person shall mean any other person or entity controlling, controlled by or under common Control with such Person.

"<u>Affiliate Agreements</u>" shall have the meaning set forth in <u>Section 2.14.5</u> hereof.

"<u>Agreement</u>" shall have the meaning set forth in the preamble.

"<u>Annual Budget</u>" shall have the meaning set forth in <u>Section 6.2</u> hereof.

"<u>Approved Accountant</u>" shall mean an independent certified public accountant selected by Mezzanine Borrower and approved by Mezzanine Lender.

"<u>Approved Budget</u>" shall have the meaning set forth in <u>Section 6.2</u> hereof.

"<u>Approved Sales Contract</u>" shall have the meaning set forth in <u>Section 9.2.1</u> hereof.

"<u>Bankruptcy Code</u>" shall mean 11 U.S.C. § 101 et seq., as the same may be amended from time to time.

"<u>Bankruptcy Event</u>" shall have the meaning set forth in <u>Section 8.18.4</u>.

"<u>Basic Interest</u>" shall mean, with respect to each Due Date, the amount of interest due on such Due Date calculated on the Outstanding Principal Amount calculated at the Basic Interest Rate, on the basis of a 360-day year for the actual number of days elapsed.

"<u>Basic Interest Rate</u>" shall mean, as applicable, (i) a fixed rate equal to eleven and one-half percent (11.5%) per annum, for any Accrual Period or portion thereof through and including the Scheduled Maturity Date, or (ii) a fixed rate equal to twelve percent (12.0%) per annum, for any Accrual Period or portion thereof during the Extension Term, if any.

"best knowledge (or any similar phrase)" shall mean the knowledge of Mezzanine Borrower, Mortgage Borrower and/or any Guarantor, as applicable, after due inquiry and investigation. If any entity with respect to which this term would be applicable is a corporation, knowledge of such entity shall refer to actual knowledge of its officers or directors, after having made due inquiry. If any such entity is a partnership, knowledge of such entity shall refer to actual knowledge of each of its partners who participates in the management of such partnership (directly or indirectly), after having made due inquiry. If any such entity is a limited liability company, knowledge of such entity shall refer to actual knowledge of its managing members, after having made due inquiry. The knowledge of each Loan Party for purposes of this definition shall also include the knowledge of the Manager if it is an Affiliate of a Loan Party. The obligation for "due inquiry and investigation" in the context of any representation or warranty regarding or relating to Hazardous Substances shall be satisfied by review of a current Phase I environmental report (and, if recommended by the Phase I environmental report, a Phase II environmental report) in respect of the Property.

"Board" shall have the meaning set forth in Section 9.2.13(a) hereof.

"Borrower's Equity Investment" shall have the meaning set forth in Section 3.3 hereof.

"Business Day" shall mean any day other than a Saturday or Sunday or a legal holiday on which commercial banks are authorized or required to be closed for business in New York, New York.

"Change in Control Event" shall mean any transaction or series of transactions (including by way of merger, consolidation, exchange, dividend, hypothecation, Transfer, distribution, redemption or similar event) or any other event (including death, disability, incapacity, dissolution, insolvency, resignation, withdrawal or similar occurrence) the result of which is that at least two (2) of the Individual Guarantors no longer control, directly or indirectly, Mezzanine Borrower.

"Code" shall have the meaning set forth in Section 4.1.13 hereof.

"Collateral" shall mean all collateral security now or hereafter pledged, granted or mortgaged to Mezzanine Lender pursuant to the Mezzanine Loan Documents.

"Condominium" shall have the meaning set forth in Section 9.1.1 hereof.

"Condominium Benchmarks" shall have the meaning set forth in Section 9.1.5 hereof.

"Condominium Conversion" shall have the meaning set forth in Section 9.1.1 hereof.

"Condominium Documents" shall have the meaning set forth in Section 9.1.2(a) hereof.

"Contract Vendee" shall have the meaning set forth in Section 9.2.1(a) hereof.

"Control" shall mean the power to direct the management and policies of a Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise; and the terms "controls", "controlling" and "controlled" have the meanings correlative to the foregoing.

"Conversion Date" shall mean the date of the Conversion Event.

"Conversion Event" shall mean the satisfaction in full and discharge of the Senior Mortgage.

"Default" shall have the meaning set forth in Section 7.1 hereof.

"Default Rate" shall mean the lesser of (a) twenty-four percent (24%) per annum, and (b) the maximum rate permitted by applicable law.

"Distributions" shall mean any and all dividends, including capital dividends, stock or liquidating dividends, and distributions of money or property, redemptions or any other distributions of any kind or character made by Mortgage Borrower or Mezzanine Borrower on or in respect of the Ownership Interests in Mortgage Borrower or Mezzanine Borrower and any and all cash and other property received in payment of the principal of or in redemption of or in exchange for any Ownership Interests in Mortgage Borrower or Mezzanine Borrower or any other owner of interests in Mortgage Borrower or Mezzanine Borrower.

"Division" shall have the meaning set forth in Section 9.1.2 hereof.

"Due Date" shall mean (a) the Effective Date in respect of the period commencing on the Effective Date through and including the last day of the calendar month in which the Effective Date occurs, and (b) August 1, 2005 and the first (1st) day of each and every calendar month thereafter through and including the Maturity Date or, if the first (1st) day of any such calendar month is not a Business Day, the first Business Day thereafter.

"Effective Date" shall mean the date on which this Agreement is executed and delivered by Mezzanine Borrower to Mezzanine Lender.

"Election Notice" shall have the meaning set forth in Section 2.8.1 hereof.

"Environmental Laws" shall have the meaning ascribed to such term in the Hazardous Waste Indemnity.

"Environmental Report" shall have the meaning ascribed to such term in Section 5.5.1(a) hereof.

- 4 -

"ERISA" shall have the meaning set forth in Section 4.1.11 hereof.

"Event of Default" shall have the meaning set forth in Section 7.1 hereof.

"Extended Maturity Date" shall mean August 1, 2007.

"Extending Tenant" shall have the meaning set forth in Section 9.1.3 hereof.

"Extension Conditions" shall have the meaning set forth in Section 2.8.1 hereof.

"Extension Option" shall have the meaning set forth in Section 2.8.1 hereof.

"Extension Term" shall mean the period commencing on the date immediately following the Scheduled Maturity Date to and including the Extended Maturity Date.

"Free Cash Flow" shall mean (a) prior to the Conversion Date, all Distributions and all Receipts permitted by Senior Lender to be distributed to members of Mortgage Borrower or Affiliates of Mortgage Borrower, other than as permitted under Section 6.3.1.(b) and Section 9.2.9. hereof and (b) after the Conversion Date, all Distributions and all Receipts of Mortgage Borrower and Mezzanine Borrower other than reasonable and customary operating expenses of the Property and Unit Sales Expenses, in each case approved by Mezzanine Lender and payable to a Person who is not a Loan Party or an Affiliate of a Loan Party, other than as permitted under Section 6.3.1.(b) and Section 9.2.9. hereof. Without limiting the generality of the foregoing, from and after the Conversion Date, Release Consideration shall constitute Free Cash Flow.

"GAAP" shall have the meaning set forth in Section 6.1.1 hereof.

"Governmental Authority" shall mean the United States, any state, regional or local government, and any political subdivision of any of the foregoing, and any agency, department, commission, board, court, bureau or instrumentality of any of them.

"Guarantor" shall mean, individually and collectively as the context requires, Eduardo Avila, a natural person, Jack Kaplan, a natural person, and Mezzanine Owner.

"Guaranty" shall mean that certain Guaranty Agreement, dated as of the Effective Date, executed and delivered by Guarantor to Mezzanine Lender, as same may hereafter be amended, modified, supplemented, restated or replaced from time to time.

"Hazardous Substances" shall have the meaning ascribed to such term in the Hazardous Waste Indemnity.

"Hazardous Substances Release" shall mean, with respect to any Hazardous Substance, any release, deposit, discharge, emission, leaking, leaching, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of such Hazardous Substance.

"Hazardous Waste Indemnity" shall mean that certain Hazardous Waste Indemnity with respect to the Property, dated as of the Effective Date, made jointly and severally by Mezzanine Borrower and Guarantor to Mezzanine Lender, as same may hereafter be amended, modified, supplemented, restated or replaced from time to time.

"Impositions" shall mean all real estate taxes, assessments (including, without limitation, all assessments for public improvements or benefits), frontage and sewer rents, water meter charges, charges for public or private utilities, license or permit fees, inspection fees and other governmental levies or payments, of every kind and nature whatsoever, general and special, ordinary and extraordinary, unforeseen as well as foreseen, which at any time may be assessed, levied, confirmed, imposed or which may become a lien upon the Property, or any portion thereof, or which are payable with respect thereto, or upon the rents, issues, revenues, income or profits thereof, or on the occupancy, operation, use, possession or activities thereof, whether any or all of the same be levied directly or indirectly or as excise taxes or as income taxes and, except for Mezzanine Lender's state and federal income, franchise tax obligations and taxes and obligations of similar type which are not assessed in lieu of any of the foregoing, all taxes, assessments or charges which may be levied on this Agreement or the Mezzanine Note.

"Impound Account" shall have the meaning set forth in Section 2.10 hereof.

"Indemnified Party" shall have the meaning set forth in Section 8.17 hereof.

"Independent" shall mean, when used with respect to the applicable entity, a Person who: (a) does not have any direct financial interest or any material indirect financial interest in such entity or in any of its Affiliates, (b) is not connected with such entity or in any of its Affiliates as an officer, employee, promoter, underwriter, trustee, partner, member, manager, creditor, director or Person performing similar functions, and (c) is not a member of the immediate family of an entity or Person defined in clause (a) or clause (b) above.

"Independent Director" shall mean a natural person who is a duly appointed member of the board of directors (or a similar governing body or organization approved by Mezzanine Lender) of the relevant Person (which shall be an entity) who is Independent and shall not have been, at the time of such appointment, at any time after appointment, or at any time in the preceding five (5) years, (a) a direct or indirect legal or beneficial owner in such Person or any of its Affiliates, (b) a creditor, customer, supplier, employee, officer, director, manager, member, partner, shareholder, family member, counsel, accountant, advisor, consultant, agent or contractor of such Person or any of its Affiliates, or (c) a natural person who controls (whether directly, indirectly, or otherwise) such Person or any of its Affiliates or any creditor, supplier, employee, officer, director, manager or contractor of such Person or any of its Affiliates.

"Individual Guarantors" shall mean, collectively, Eduardo Avila, a natural person, and Jack Kaplan, a natural person.

"Initial Budget" shall have the meaning set forth in Section 6.2 hereof.

- 6 -

"Initial Term" shall mean the period commencing on the Effective Date to and including the Scheduled Maturity Date.

"Intended Use" shall mean the use of the Property for 451 luxury condominium units, plus all applicable parking and amenities.

"Intercreditor Agreement" shall mean that certain Recognition Agreement, dated of even date herewith, between Senior Lender and Mezzanine Lender, as the same may hereafter be amended, modified, supplemented, restated or replaced from time to time.

"Interest Reserve" shall have the meaning set forth in Section 2.4.3 hereof.

"Investor" shall have the meaning set forth in Section 8.16.1 hereof.

"Late Charge(s)" shall mean the payment in the amount of five (5%) percent of any payment required to be made under this Agreement or any of the Mezzanine Loan Documents, which payment is not made on or prior to the due date set forth in this Agreement and/or the other Mezzanine Loan Documents.

"Leases" shall mean all leases and other agreements or arrangements for the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Property.

"Legal Requirement" shall mean any law, statute, ordinance, order, rule, regulation, decree or other requirement of a Governmental Authority, and all conditions of any Permit.

"Lien" shall mean any mortgage, pledge, lien, security interest (including, without limitation, a purchase money security interest), encumbrance, charge, attachment, levy, distraint or other judicial process.

"Loan Documents" shall mean the Senior Loan Documents and/or the Mezzanine Loan Documents, as the context in which the term is used requires.

"Loan Party" or "Loan Parties" shall have the meaning set forth in Section 4.1.1 hereof.

"Loan Transfer" shall have the meaning set forth in Section 8.16.1 hereof.

"Major Decision" shall mean any decision of or on behalf of Mortgage Borrower or Mezzanine Borrower to: (a) engage in any business or activity other than as set forth in Mortgage Borrower's or Mezzanine Borrower's Organizational Documents in effect as of the Effective Date; (b) incur any Obligations or assume or guaranty any Obligations of any other Person, other than in connection with any business or activity as set forth in Mortgage Borrower's or Mezzanine Borrower's Organizational Documents in effect as of the Effective Date; (c) voluntarily dissolve or liquidate, in whole or in part; (d) consolidate or merge with or

into any other Person or convey or transfer its properties and assets substantially as an entirety to any other Person other than as set forth in Mortgage Borrower's or Mezzanine Borrower's Organizational Documents in effect as of the Effective Date; (e) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect, including, but not limited to, the Bankruptcy Code, or seek the appointment of a trustee, receiver, liquidator, custodian, examiner or other similar official of it or any substantial part of its property, or consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or make a general assignment for the benefit of creditors, or fail generally to pay its debts as they become due, or take any action to authorize any of the foregoing; or (f) amend Mortgage Borrower's or Mezzanine Borrower's Organizational Documents.

"Management Agreement" shall mean that certain Management Agreement dated as of the date hereof, between Mortgage Borrower and Manager for the management of the Property, as the same may be amended or modified in accordance with the terms hereof, and any replacement thereof entered into in accordance with the terms of this Agreement.

"Management Event" shall mean and include (a) the occurrence of any Event of Default, (b) the occurrence of any material default (i) by the Manager beyond any applicable cure period under the Management Agreement or (ii) by the Sales Agent beyond any applicable cure period under the Sales Agency Agreement, or (c) breach of any of the provisions of Article 9.

"Manager" shall have the meaning set forth in Section 6.3.1 hereof.

"Manager Assignment and Subordination" shall have the meaning set forth in Section 6.3.1(b) hereof.

"Material Adverse Effect" means a material adverse effect upon (a) the business or the financial position or results of operation of any party or entity, (b) the ability of Mezzanine Borrower or any Guarantor, as applicable, to perform, or of Mezzanine Lender to enforce, any of the Mezzanine Loan Documents, (c) the value of the Pledged Collateral, or (d) the value of the Property.

"Maturity Date" shall mean the earlier to occur of (a) the Scheduled Maturity or the Extended Maturity Date (to the extent that the Extended Option are properly exercised), as the case may be, as more particularly described in Section 2.8.1 hereof, (b) the date on which Mezzanine Lender accelerates the Mezzanine Loan pursuant to the provisions of this Agreement or any of the other Mezzanine Loan Documents, or (c) the date on which Mezzanine Borrower elects, in a Prepayment Notice, to pay in whole or in part the Outstanding Loan Obligations in accordance with and to the extent permitted by this Agreement.

"Mezzanine Assignment of Contracts" shall mean an Assignment of Contracts, Licenses, Permits, Agreements, Warranties and Approvals (including Unit sales contracts), to be

- 8 -

executed as of the Conversion Date in a form satisfactory to Mezzanine Lender, by Mortgage Borrower, as assignor, in favor of Mezzanine Lender, as assignee, as the same may hereafter be amended, modified, supplemented, restated or replaced from time to time.

"Mezzanine Assignment of Leases" shall mean an Assignment of Leases and Rents, to be executed as of the Conversion Date in a form satisfactory to Mezzanine Lender, by Mortgage Borrower, as assignor, in favor of Mezzanine Lender, as assignee, as the same may hereafter be amended, modified, supplemented, restated or replaced from time to time.

"Mezzanine Borrower" shall have the meaning set forth in the preamble.

"Mezzanine Cash Collateral Account" shall have the meaning set forth in the Mezzanine Cash Management Agreement.

"Mezzanine Cash Management Agreement" shall have the meaning set forth in Section 2.14.2 hereof.

"Mezzanine Lender" shall have the meaning set forth in the preamble.

"Mezzanine Lender's Target Interest Rate" shall mean, as applicable, (i) sixteen percent (16%) per annum, based on monthly compounding, for the Initial Term, and (ii) eighteen percent (18%) per annum, based on monthly compounding, for the Extension Term.

"Mezzanine Lender's Target Internal Rate of Return" shall be the achieved at such time as Lender receives an aggregate return on all Mezzanine Lender Advances from the Effective Date to the date of repayment in full of the Mezzanine Loan, computed using Mezzanine Lender's Target Interest Rate, and subtracting therefrom Mezzanine Lender Receipts during such period as determined by Mezzanine Lender in its sole and absolute discretion.

As used herein:

(a) "Mezzanine Lender Advances" shall mean each advance made by Lender under the Mezzanine Loan Documents, including, without limitation, the Mezzanine Loan and any other advances (including protective advances, if any) which Mezzanine Lender makes under the Mezzanine Loan Documents.

(b) "Mezzanine Lender Receipts" shall mean the sum of each payment made by or on behalf of Mezzanine Borrower to Mezzanine Lender in the nature of principal, interest, or other sums and charges due and payable under the Mezzanine Loan Documents, expressly excluding, however, (i) the Origination Fee, (ii) Late Charges, (iii) interest payable at the Default Rate, (iv) due diligence fees and reimbursements of costs and expenses, and (v) any amounts paid by or on behalf of Mezzanine Borrower pursuant to Sections 6.7, 7.2 or 8.17 or Article X hereof.

- 9 -

In determining Mezzanine Lender's Target Internal Rate of Return, the following shall apply:

(1) All calculations shall be made as of the last day of the month in which the related Mezzanine Lender Receipt was actually received by Mezzanine Lender. For the purposes of each calculation, the Mezzanine Loan will be assumed to be outstanding no less than six (6) months after the date of the advance of the Mezzanine Loan Amount.

(2) Mezzanine Lender's Target Internal Rate of Return shall be calculated on a compounded monthly basis.

(3) All Mezzanine Lender Advances shall be treated as having been advanced to Mezzanine Borrower on the first day of the month in which such advance was disbursed or accrued.

(4) All Mezzanine Lender Receipts shall be treated as having been received by Mezzanine Lender on the day of the month on which such Mezzanine Lender Receipts are actually received by Mezzanine Lender.

(5) All Principal Reduction Payments shall be treated as payments applied towards the outstanding principal balance of the Mezzanine Loan.

"Mezzanine Loan" shall have the meaning set forth in the Recitals.

"Mezzanine Loan Amount" shall have the meaning set forth in the Recitals.

"Mezzanine Loan Documents" shall have the meaning set forth in Section 2.3 hereof.

"Mezzanine Mortgage" means a first Mortgage, Assignment of Leases and Rents, Security Agreement and Financing Statement encumbering the Property, to be executed as of the Conversion Date in a form satisfactory to Mezzanine Lender, by Mortgage Borrower to Mezzanine Lender, as the same may hereafter be amended, modified, supplemented, increased, consolidated, extended, restated, replaced, split or severed from time to time.

"Mezzanine Note" shall have the meaning set forth in Section 2.1 hereof.

"Mezzanine Owner" shall mean Millenia Luxury Condominium (Florida), LLC, a Florida limited liability company.

"Minimum Release Consideration" shall have the meaning ascribed to such term in Section 9.2.9 of this Agreement.

"Mortgage Borrower" shall have the meaning set forth in the Recitals.

NYC01_84033442_7_334016_00003 6/28/2005 3:59 PM

"Mortgage Recording Expenses" shall have the meaning set forth in Section 2.16 hereof.

"Mortgage Tax Reserve" shall have the meaning set forth in Section 2.16 hereof.

"Mortgagee Title Policy" shall mean that certain title insurance policy, dated the date hereof, issued by the Title Company to Senior Lender under Policy No. 505089 in the amount of the Senior Loan on the Effective Date.

"Net Unit Sales Proceeds" shall have the meaning ascribed to such term in Section 9.2.9 of this Agreement.

"Net Upgrade Cost" shall have the meaning ascribed to such term in Section 9.2.5 of this Agreement.

"New Mortgage Loan" shall have the meaning set forth in Section 8.20 hereof.

"Obligations" shall have the meaning set forth in Section 4.1.10 hereof.

"Occupied Unit Contract" shall have the meaning set forth in Section 9.2.11 hereof.

"OFAC List" shall mean the list of specially designated nationals and blocked persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and accessible through the internet website www.treas.gov/ofac/t11sdn.pdf.

"Organizational Documents" shall mean (a) with respect to a corporation, the articles of incorporation, bylaws and certificate of incorporation of such corporation, (b) with respect to a partnership, the partnership agreement and the certificate of partnership of such partnership, and (c) with respect to a limited liability company, the operating agreement and certificate of formation of such limited liability company.

"Origination Fee" shall mean the fee in the amount of two and one-half percent (2.50%) of the Mezzanine Loan Amount payable by Mezzanine Borrower to Mezzanine Lender on the Effective Date as a condition precedent to Mezzanine Lender's obligation to fund the Mezzanine Loan.

"Outstanding Loan Obligations" shall mean the sum, from time to time, of (a) the Outstanding Principal Amount, (b) accrued and unpaid Basic Interest, (c) accrued and unpaid interest at the Default Rate, (d) Late Charges, (e) all costs of collection, (f) the Origination Fee, (g) the Supplemental Payment, (h) payments to the Interest Reserve and/or the Impound Account as provided herein, (i) the Additional Appreciation Interest, (j) all other amounts due and payable under this Agreement and the other Mezzanine Loan Documents.

NYC01_84033442_7_334016_00003 6/28/2005 3:59 PM

"Outstanding Principal Amount" shall mean the outstanding principal amount of the Mezzanine Loan from time to time.

"Ownership Interest" shall mean, in the case of any Person, any interest in such Person, direct or indirect, contingent or fixed, on any tier, of any nature whatsoever, whether in the form of a partnership interest, stock interest, membership interest, equitable interest, beneficial interests, profit interest, loss interest, voting rights or otherwise.

"Permit" shall mean all approvals, consents, registrations, franchises, permits, licenses, variances, certificates of occupancy and other authorizations with regard to zoning, landmark, ecological, environmental, air quality, subdivision, planning, building or land use required by any Governmental Authority for the construction, lawful occupancy and operation of the Improvements, and the actual and contemplated uses thereof and the Condominium Conversion.

"Permitted Encumbrances" shall mean the encumbrances listed on Schedule B of the Mortgagee Title Policy.

"Permitted Estate/Family Transfer" shall mean, as applicable, a Transfer (a) upon the death of a partner, shareholder or member of any partnership, corporation or limited liability company that is a direct or indirect member of Mezzanine Owner (such partner, shareholder or member, an "Upper Tier Owner"), to the estate of such Person or to an inter vivos trust established and controlled by such Person, (b) to the legal representative of an Upper Tier Owner in the event such Person is no longer legally competent to conduct his affairs, (c) to any beneficiary under the will of an Upper Tier Owner, or any trust established pursuant thereto, upon the death of such Person, or (d) to the spouse, child or parent of a member of an Upper Tier Owner; provided that, in all cases, no Change in Control Event shall have occurred as a result of any of such Transfer(s).

"Person" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Pledge Agreement" shall have the meaning set forth in Recitals.

"Pledged Collateral" shall have the meaning ascribed to such term in the Pledge Agreement.

"Prepayment Notice" shall have the meaning set forth in Section 2.5 hereof.

"Principal Reduction Payments" shall have the meaning set forth in Section 9.2.9 hereof.

- 12 -

"Prohibited Person" shall mean any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Project" shall mean the construction and development of the Property for the Intended Use.

"Project Consultant" shall mean such consultant approved by Mezzanine Lender in its sole discretion, the cost of which shall be paid for by Mezzanine Borrower.

"Property" shall have the meaning set forth in the Recitals hereto.

"Prospectus" shall have the meaning set forth in Section 9.1.2 hereof.

"Receipts" shall mean any and all rents, issues, profits, payments, income, receipts, revenues, deposits (other than security deposits which Mortgage Borrower is not entitled to retain or apply to defaults), guest room revenues, food, beverage, catering and promotional and merchandise sales receipts, concession revenues, revenues, proceeds, reimbursements, receipts and similar items in whatever form (including, without limitation, cash, checks, money orders or other instruments for the payment of money) derived from, or generated by, the use, ownership, leasing or operation of the Property, including, without limitation, (a) real estate tax refunds (net of any reasonable and customary fees and disbursements of tax certiorari counsel deducted from such refund to pay such counsel's fee and reimbursable expenses) and refunds of insurance premiums, (b) proceeds of any insurance, including, without limitation, rent interruption insurance, (c) condemnation awards, (d) all sums paid with respect to a modification, rejection or termination of any Lease (including in any bankruptcy case) or otherwise paid in connection with taking any action under any Lease (e.g., granting a consent) or waiving any provision thereof, (e) damages or other payments in settlement of claims by Mortgage Borrower against tenants or other third parties in connection with the Property, and (f) gross proceeds of any transfer or sale of Units, or interests in the Property or any items of the Collateral securing the Mezzanine Loan or of any partial interest in such Collateral or Mortgage Borrower.

"Release Consideration" shall have the meaning set forth in Section 9.2.9 hereof.

"Required Insurance" shall have the meaning set forth in Section 5.3.1 hereof.

"Sales Agency Agreement" shall mean that certain Sales and Marketing Agreement between Mortgage Borrower and Key Realty Advisors, Inc., dated as of June 20, 2005, for the sales and marketing of Units at the Property, as the same may be amended or modified in accordance with the terms hereof and any replacement thereof entered into in accordance with the terms of this Agreement.

"Sales Agent" shall have the meaning set forth in Section 6.3.2 hereof.

"Sales Agent Differential" shall have the meaning set forth in Section 9.2.9 hereof.

"Sales Agent Assignment and Subordination" shall have the meaning set forth in Section 6.3.2 hereof.

"Scheduled Maturity Date" shall mean February 1, 2007, or if such date is not a Business Day, then the next Business Day.

"Senior Cash Management Agreement" shall have the meaning set forth in Section 2.14.1 hereof.

"Senior Lender" shall have the meaning set forth in Recitals.

"Senior Loan" shall have the meaning set forth in Recitals.

"Senior Loan Agreement" shall mean the Loan and Security Agreement between Senior Lender and Mortgage Borrower, as the same may be amended, modified and in effect from time to time.

"Senior Loan Documents" shall mean the Senior Loan Agreement, the Senior Mortgage, and all other documents, agreements and instruments evidencing, securing or delivered to Senior Lender in connection with the Senior Loan, including, but not limited to, any promissory note, assignment of leases and rents, guaranty, and Uniform Commercial Code financing statements; as each of the foregoing may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Senior Loan Event of Default" shall mean an "Event of Default" under and as defined in the Senior Loan Agreement or any of the other Senior Loan Documents.

"Senior Loan Maturity Date" shall have the meaning set forth in Section 2.8.1 hereof.

"Senior Lockbox" shall have the meaning set forth in Section 2.14.3 hereof.

"Senior Mortgage" shall have the meaning set forth in Recitals.

"Servicer" shall have the meaning ascribed to such term in Section 2.17 hereof.

"Servicing Fee" shall have the meaning ascribed to such term in Section 2.17 hereof.

"Short Period Interest" shall mean Basic Interest at the Basic Interest Rate on the Outstanding Principal Amount for the period commencing on the Effective Date through and including the last day of the calendar month in which the Effective Date occurs.

- 14 -

"Single Purpose Entity" shall mean an entity complying with the provisions of Section 5.1.6 hereof.

"Standard & Poor" shall mean Standard & Poor's Ratings Group, a division of the McGraw-Hill Companies.

"Supplemental Payment" shall mean an amount which, when added to all Mezzanine Lender Receipts, would be sufficient to permit Mezzanine Lender to receive Mezzanine Lender's Target Internal Rate of Return.

"Termination Notice" shall have the meaning set forth in Section 9.1.3 hereof.

"Title Company" shall mean (a) with respect to the Senior Loan, Stewart Title Guaranty Company, and (b) with respect to the Mezzanine Loan, Chicago Title Insurance Company.

"Title Policy" shall have the meaning ascribed thereto in Section 3.4 of this Agreement.

"Transfer" shall have the meaning set forth in Section 6.4 hereof.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect in the State of Delaware.

"Unit Sales Expenses" shall have the meaning set forth in Section 9.2.9 hereof.

"Unit(s)" shall have the meaning set forth in Section 9.1.1 hereof.

"Working Capital Amount" shall have the meaning set forth in Section 2.14.7 hereof.

Definitional Matters. All accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP. The words "herein", "hereof", and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or other subdivision. All references to sections and schedules are to sections and schedules in and to this Agreement unless otherwise specified. The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

ARTICLE II

TERMS OF MEZZANINE LOAN

Section 2.1. Mezzanine Loan. Subject to the terms and conditions of this Agreement, Mezzanine Lender agrees to make the Mezzanine Loan for the Mezzanine Loan Amount to Mezzanine Borrower. The Mezzanine Loan will be evidenced by a promissory note, dated the