Protection Agency (the "EPA") or on the inventory of other potential "Problem" sites issued by the EPA and has not otherwise been identified by the EPA as a potential CERCLA site or included or, to Mezzanine Borrower's knowledge, after due inquiry and investigation, proposed for inclusion on any list or inventory issued pursuant to any other Environmental Law, if any, or issued by any other Governmental Authority. Mezzanine Borrower covenants that Mezzanine Borrower will comply and will cause Mortgage Borrower to comply with all Environmental Laws affecting or imposed upon Mezzanine Borrower, Mortgage Borrower or the Property.

5.5.8. Mezzanine Borrower covenants that it shall promptly notify Mezzanine Lender of the presence (other than heating oil, cleaning fluids, pesticides and other substances customarily used in the operation of properties that are being used for similar purposes as the Property is presently being used in compliance with applicable Legal Requirements) and/or release of any Hazardous Substances and of any request for information or any inspection of the Property or any part thereof by any Governmental Authority with respect to any Hazardous Substances and provide Mezzanine Lender with copies of such request and any response to any such request or inspection. Mezzanine Borrower covenants that it shall, in compliance with applicable Legal Requirements, conduct or cause to be conducted and complete all investigations, studies, sampling and testing (and promptly shall provide Mezzanine Lender with copies of any such studies and the results of any such test) and all remedial, removal and other actions necessary to clean up and remove all Hazardous Substances in, on, over, under, from or affecting the Property or any part thereof in accordance with all such Legal Requirements applicable to the Property or any part thereof to the reasonable satisfaction of Mezzanine Lender.

5.5.9. Following the occurrence of an Event of Default hereunder, and without regard to whether Mezzanine Lender shall have taken possession of the Property or the Collateral or a receiver has been requested or appointed or any other right or remedy of Mezzanine Lender has or may be exercised hereunder or under any other Mezzanine Loan Document, Mezzanine Lender shall have the right (but no obligation) to conduct such investigations, studies, sampling and/or testing of the Property or any part thereof as Mezzanine Lender may, in its discretion, determine to conduct, relative to Hazardous Substances. All costs and expenses incurred in connection therewith including, without limitation, consultants' fees and disbursements and laboratory fees, shall constitute a part of the Outstanding Loan Obligations and shall, upon demand by Mezzanine Lender, be immediately due and payable and shall bear interest at the Default Rate from the date so demanded by Mezzanine Lender until reimbursed. Mezzanine Borrower shall and shall cause Mortgage Borrower to, at its sole cost and expense, expeditiously cooperate in all reasonable respects in all such investigation, studies, samplings and/or testings, including, without limitation, providing all relevant information and making knowledgeable people available for interviews.

5.5.10. Mezzanine Borrower represents and warrants that except in accordance with all applicable Environmental Laws and as disclosed in the Environmental Report, (a) no underground treatment or storage tanks or pumps or water, gas, or oil wells are or have been located on the Property, (b) no PCBs or transformers, capacitors, ballasts or other equipment that contain dielectric fluid containing PCBs are located on the Property, (c) no insulating material

- 49 -

containing urea formaldehyde is located on the Property, and (d) no asbestos containing material is located on the Property.

Section 5.6. <u>Environmental Indemnification</u>. Mezzanine Borrower shall defend, indemnify and hold harmless Mezzanine Lender and the other Indemnified Parties for, from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, known or unknown, contingent or otherwise, whether incurred or imposed within or outside the judicial process, including, without limitation, reasonable attorneys' and consultants' fees and disbursements and investigations and laboratory fees, arising out of, or in any way related to any spill or adverse effects of any environmental activity or with the presence, use, storage, disposal, generation, transportation or treatment of any Hazardous Substance at, on, under, from, affecting or related to the Property, or in the soil, groundwater or soil vapor on or under the Property, whether or not originating or emanating from the Property, including, without limitation:

(a) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release or threat of release of any Hazardous Substances in, on, over, under, from or affecting the Property or any part thereof, whether or not disclosed by the Environmental Report;

(b) any personal injury (including wrongful death, disease or other health condition related to or caused by, in whole or in part, any Hazardous Substances) or property damage (real or personal) arising out of or related to any Hazardous Substances in, on, over, under, from or affecting the Property or any part thereof, whether or not disclosed by the Environmental Report;

(c) any action, suit or proceeding brought or threatened, settlement reached, or order of any Governmental Authority relating to any Hazardous Substance, whether or not disclosed by the Environmental Report; and/or

(d) any violation of the provisions, covenants, representations or warranties of <u>Section 5.5</u> hereof or of any Legal Requirement which is based on or in any way related to any Hazardous Substances in, on, over, under, from or affecting the Property or any part thereof, including, without limitation, the cost of any work performed and materials furnished in order to comply therewith, whether or not disclosed by the Environmental Report.

Notwithstanding the foregoing provisions of this <u>Section 5.6</u> to the contrary, Mezzanine Borrower shall have no obligation to indemnify any Indemnified Parties for liabilities, claims, damages, penalties, causes of action, costs and expenses relative to the foregoing to the extent resulting from (A) any Indemnified Party's willful misconduct or gross negligence or (B) any Hazardous Substances initially placed in, on or under the Property or any other condition relating to Hazardous Substances created after foreclosure, delivery of a deed in lieu of foreclosure or other taking of title to the Property by Mezzanine Lender or its successors and assigns. Any amounts payable to Mezzanine Lender by reason of the application of this <u>Section 5.6</u> shall be secured by the Mezzanine Loan Documents and shall, upon demand by Mezzanine Lender,

become immediately due and payable and shall bear interest at the Default Rate from the date so demanded by Mezzanine Lender until paid.

This indemnification shall survive the termination of this Agreement whether by repayment of the Outstanding Loan Obligations, foreclosure or deed in lieu thereof, assignment, or otherwise. The indemnity provided for in this Section 5.6 shall not be included in any exculpation of Mezzanine Borrower or its principals from personal liability provided for in this Agreement or in any of the other Mezzanine Loan Documents. Nothing in this Section 5.6 shall be deemed to deprive Mezzanine Lender of any rights or remedies otherwise available to Mezzanine Lender, including, without limitation, those rights and remedies provided elsewhere in this Agreement or the other Mezzanine Loan Documents.

Section 5.7.    Condemnation. In the event that all or any portion of the Property shall be damaged or taken through condemnation (which term shall include any damage or taking by any governmental authority, quasi-governmental authority, any party having the power of condemnation, or any transfer by private sale in lieu thereof), or any such condemnation shall be threatened, Mezzanine Borrower shall give prompt written notice to Mezzanine Lender. Mezzanine Lender acknowledges that Mortgage Borrower's rights to any condemnation award is subject to the terms of the Senior Mortgage and, from and after the Condominium Conversion, the Condominium Documents. Notwithstanding the foregoing, Mezzanine Borrower may not and shall not permit Mortgage Borrower to settle or compromise any claim, action or proceeding relating to such damage or condemnation without the prior written consent of Mezzanine Lender, which shall not be unreasonably withheld, delayed or denied; provided that Mortgage Borrower may settle, adjust and compromise any such claim, action or proceeding which is of an amount less than $250,000 provided no Event of Default has occurred. Any proceeds remaining after the application of any award to reconstruct or repair the Property or to the payment of the Senior Loan shall be paid to Mezzanine Lender and applied to the payment of the Outstanding Loan Obligations whether or not then due. In the event that Mortgage Borrower is permitted pursuant to the terms of the Senior Mortgage, or from and after the Condominium Conversion, is required pursuant to the Condominium Documents, to reconstruct, restore or repair the Property following a condemnation of any portion of the Property, Mezzanine Borrower shall cause Mortgage Borrower to promptly and diligently repair and restore the Property in the manner and within the time periods required by the Senior Mortgage, the Condominium Documents (if applicable), the Leases and any other agreements affecting the Property. In the event that Mortgage Borrower is permitted pursuant to the terms of the Senior Mortgage, or, from and after the Condominium Conversion, the Condominium Documents, to elect not to reconstruct, restore or repair the Property following a condemnation of any portion of the Property, Mezzanine Borrower shall not permit Mortgage Borrower to elect not to reconstruct, restore or repair the Property without the prior written consent of Mezzanine Lender.

ARTICLE VI

REPORTING AND OTHER AGREEMENTS

Section 6.1.    Financial Reporting.

6.1.1. Mezzanine Borrower shall keep or cause to be kept, and shall cause Mortgage Borrower to keep, proper records and books of account for each of Mezzanine Borrower and Mortgage Borrower in accordance with generally accepted accounting principles consistently applied in the United States ("GAAP"). Such records and books of account shall be kept at the principal office of Mezzanine Borrower and shall be open for the reasonable examination and copying by Mezzanine Lender or its authorized representatives during normal business hours upon reasonable prior written notice.

6.1.2. Mezzanine Borrower shall furnish or cause to be furnished to Mezzanine Lender, within the time periods specified below, the following financial reports and information, which reports and information must be acceptable in form and substance to Mezzanine Lender:

(a)    As soon as available, but in no event later than twenty (20) days after the last day of each calendar quarter, a balance sheet and statement of income and changes in financial position (including statements of cash flow) of each of Mezzanine Borrower and Mortgage Borrower. The foregoing quarterly reports and statements shall be prepared in detail reasonably satisfactory to Mezzanine Lender, and certified by an officer of Mezzanine Borrower to have been prepared in accordance with GAAP as of the date of the applicable financial report;

(b)    As soon as available, but in no event later than twenty (20) days after the last day of each calendar month, a monthly operating statement showing all Receipts, expenses and net cash flow of Mortgage Borrower and Mezzanine Borrower for the applicable calendar month, year-to-date results and variances from the same month in the prior calendar year and from the Approved Budget, and such other matters as Lender shall reasonably require, which monthly operating statements shall be in form and substance reasonably acceptable to Mezzanine Lender and certified by an officer of Mezzanine Borrower to be true, correct and complete in all material respects and shall be prepared on a cash basis;

(c)    As soon as available, but in no event later than seventy-five (75) days after the end of each calendar year, a balance sheet, statement of income, and changes in financial position (including statements of cash flow) for Mezzanine Borrower and Mortgage Borrower. Such annual statements shall be prepared in accordance with GAAP and shall be certified by an officer of Mezzanine Borrower to be true, correct and complete in all material respects and shall be compiled and signed by the Approved Accountant;

(d)    On or before April 15 of each year during the term of the Mezzanine Loan, a copy of Mezzanine Borrower's and Mortgage Borrower's federal income tax return (including all schedules thereto) in respect of the prior tax year, prepared and signed by the Approved Accountant or, if either of such Loan Parties shall file an extension, a copy of such

extension and all working papers of the Approved Accountant figuring the liability of such Loan Party in connection with such extension, together with current revised financial statements compiled and signed by the Approved Accountant. Mezzanine Borrower and Mortgage Borrower shall promptly thereafter provide a copy of its federal income tax return (including all schedules thereto) upon filing thereof and in no event later than October 15 of each year;

(e)    As soon as available, but in no event later than ten (10) days after the end of each month, monthly leasing status reports and rent rolls with respect to the Property in form and substance reasonably acceptable to Mezzanine Lender;

(f)    As soon as available, but in no event later than twenty (20) days after the end of each month, a sales report in form acceptable to Mezzanine Lender showing all currently pending sales (separated into new sales entered into during the month being reported on and sales contracted for in preceding months), all closings which took place during the month being reported on, and all pending sales previously reported that for any reason will not close as scheduled;

(g)    Evidence of payment of real estate taxes with respect to the Property within ten (10) days after the due date thereof;

(h)    Evidence of the renewal of the insurance policies as are required under the Senior Loan Documents or the Mezzanine Loan Documents with respect to the Property thirty (30) days prior to the expiration of such insurance policies; and

(i)    Such other financial information as may be reasonably requested by Mezzanine Lender.

Section 6.2.    Budget.  For the period commencing on the date hereof and ending on December 31, 2005, the budget attached as Exhibit A to this Agreement (the "Initial Budget") shall be the budget for the Property for such period, which Initial Budget has been approved by Mezzanine Lender. An annual operating budget ("Annual Budget") for the Property prepared by Mortgage Borrower shall be submitted to Mezzanine Lender at least ninety (90) days prior to the end of Mezzanine Borrower's prior fiscal year. Such Annual Budget shall set forth in reasonable detail budgeted monthly operating income and monthly operating, capital and other expenses of the Property and include a comparison on a line item basis to the prior year's results of operation) and annual forecasts for the Property, all in form and substance acceptable to Mezzanine Lender. In the event Mezzanine Lender objects to a proposed Annual Budget, Mezzanine Lender shall advise Mezzanine Borrower of such objections in writing within twenty (20) days after receipt thereof (and deliver to Mezzanine Borrower a reasonably detailed description of such objections), and Mezzanine Borrower shall cause such Annual Budget to be revised within three (3) days after receipt of notice and resubmit the same to Mezzanine Lender. Mezzanine Lender shall advise Mezzanine Borrower in writing of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Mezzanine Borrower a reasonably detailed description of such objections), and Mezzanine Borrower shall cause such Annual Budget to be revised in accordance with the process described in this Section. In the event that

the revised Annual Budget is not acceptable to Mezzanine Lender this process shall continue (with Mezzanine Lender having in each case ten (10) days to review any submissions) until Mezzanine Lender approves an Annual Budget (each such Annual Budget, when so approved, is referred to as an "Approved Budget"). Until such time that Mezzanine Lender approves a proposed Annual Budget, the most recently approved Approved Budget shall apply, provided that, such Approved Budget shall be adjusted to reflect actual increases in real estate taxes, insurance premiums and utility costs.

Section 6.3.    Management, Etc.

6.3.1. Management.

(a) The Property is at all times to be managed on Mortgage Borrower's and Mezzanine Borrower's behalf in a competent and professional manner appropriate for multi-family apartment buildings and condominiums similar to the Property by a prominent professional managing agent (the "Manager"). Prior to engaging any Manager or executing a Management Agreement, such Manager and Management Agreement shall be subject to approval by Mezzanine Lender in its reasonable discretion, it being understood that KW Property Management, LLC, a Florida limited liability company, is hereby approved by Lender as the Manager for the Property and the Management Agreement in existence on the date hereof with the Manager is approved as the Management Agreement.

(b) Mezzanine Borrower represents that it has delivered to Mezzanine Lender a true, correct and complete copy of the Management Agreement, which Management Agreement is hereby approved by Mezzanine Lender subject to the terms of the Collateral Assignment of Management Agreement and Subordination of Management Fees, dated of even date herewith, among Mortgage Borrower, Mezzanine Borrower, Mezzanine Lender and the Manager (the "Manager Assignment and Subordination"); provided, however, that the terms and conditions of any subsequent Management Agreement between the Manager and Mortgage Borrower, or any amendment or modification of any Management Agreement between the Manager and Mortgage Borrower, and any compensation of the Manager with respect to its services performed at or in connection with the Property, are subject to approval by Mezzanine Lender in its sole and absolute discretion. In no event shall the aggregate compensation paid to Manager exceed the greater of (i) four percent (4%) per annum of Receipts (excluding proceeds from the sale of Units), and (ii) $14,000 per month.

6.3.2. Sales Agency.

(a) Sales of Units in the Property shall at all times be managed on Mortgage Borrower's and Mezzanine Borrower's behalf in a competent and professional manner appropriate for condominiums similar to the Property by a prominent professional sales agent (the "Sales Agent"). Prior to engaging any Sales Agent or executing a Sales Agency Agreement, such Sales Agent and Sales Agency Agreement shall be subject to approval by Lender in its reasonable discretion, it being understood that Key Realty Advisors, Inc. is hereby approved by

Lender as the Sales Agent for the Property and the Sales Agency Agreement in existence on the date hereof with the Sales Agent is approved as the Sales Agency Agreement.

(b) Mezzanine Borrower represents that it has delivered to Mezzanine Lender a true, correct and complete copy of the Sales Agency Agreement, which Sales Agency Agreement is hereby approved by Mezzanine Lender subject to the terms of the Collateral Assignment of Sales Agency Agreement and Subordination of Sales Agent Fees, each dated of even date herewith, among Mortgage Borrower, Mezzanine Borrower, Mezzanine Lender and the Sales Agent (the "Sales Agent Assignment and Subordination"); provided, however, that the terms and conditions of any subsequent Sales Agency Agreement between the Sales Agent and Mortgage Borrower, or any amendment or modification of any Sales Agency Agreement between the Sales Agent and Mortgage Borrower, and any compensation of the Sales Agent with respect to its services performed at or in connection with the Property, are subject to approval by Mezzanine Lender in its sole and absolute discretion. Pursuant to the Sales Agent Assignment and Subordination, Sales Agent shall agree that, until payment in full of all Obligations, neither Mortgage Borrower nor Mezzanine Lender shall be entitled to pay, and Sales Agent shall not be entitled to receive, commissions or other compensation under the Sales Agency Agreement, provided that no Management Event has occurred and is continuing, Sales Agent shall be entitled to receive the portion of its commissions approved by Lender for payment to individual sales employees of Sales Agent.

6.3.3. Management Termination. In the event that there shall have occurred and be continuing a Management Event, then, upon Mezzanine Lender's request, Mezzanine Borrower shall cause Mortgage Borrower to replace the present Manager and/or Sales Agent with a managing agent and a sales agent approved by Mezzanine Lender in its sole discretion.

Section 6.4. Refinancing/Transfer. Mezzanine Borrower will not (and will not permit Mortgage Borrower to), directly or indirectly, sell, assign, convey, pledge, hypothecate, encumber or otherwise transfer (each of the foregoing constituting a "Transfer") the Property or the Collateral or any part thereof, or any interest therein, or suffer, consent to or permit the foregoing without, in each instance, the prior written consent of Mezzanine Lender, except as permitted under Article 9 hereof and the last sentence of this Section 6.4. It shall constitute an Event of Default and the Mezzanine Loan shall become immediately due and payable upon: (a) any conveyance and/or Transfer (including, without limitation, any transfer of any direct or indirect legal or beneficial interest or any profit interest) of or interest in the equity in either Mezzanine Borrower or Mortgage Borrower; (b) the creation or imposition of any lien or encumbrance pursuant to any contractual obligation of, on, in or affecting Mezzanine Borrower and/or Mortgage Borrower or the Property, other than Liens in favor of Senior Lender pursuant to the Senior Loan Documents and Liens in favor of Mezzanine Lender pursuant to the Mezzanine Loan Documents; (c) any refinancing of the Senior Loan, and (d) any Transfer or purported Transfer of the Property, the Pledged Collateral or any part thereof or interest therein. Notwithstanding the foregoing, a Permitted Estate/Family Transfer shall not be a default hereunder, provided that Mezzanine Borrower gives Mezzanine Lender no less than ten (10) days prior written notice of such Transfer (except in the case of a Permitted Estate/Family

NYC01_84033442_7_334016_00003 6/28/2005 3:59 PM

Transfer resulting automatically from the death of the transferor Upper Tier Owner, in which event notice will be given to Mezzanine Lender within thirty (30) days after the Transfer) together with a copy of all transfer documents and other agreements to be executed in connection with such Transfer, and such additional documents related to the Transfer and the transferee as shall be reasonably required by Mezzanine Lender.

Section 6.5. <u>Leasing</u>. Without Mezzanine Lender's prior written consent, except as provided in <u>Section 9.1.4</u>, Mezzanine Borrower shall not permit Mortgage Borrower to cancel, terminate, abridge or materially modify the terms of any Lease, extend the term of such Lease, enter a new Lease, or permit the assignment of any such Lease.

Section 6.6. <u>Additional Consent Matters</u>. Without the prior written consent of Mezzanine Lender, which consent shall not be unreasonably withheld, Mezzanine Borrower shall not take, nor shall Mezzanine Borrower permit Mortgage Borrower to take, any of the following actions: (a)(i) make any improvement, renovation or refurbishment of the Property to a materially higher standard or level than that of comparable properties in the same market segment and in the same geographical area as the Property, (ii) remove, demolish or materially alter the improvements or the equipment on the Property (other than routine replacement of such equipment), or (iii) materially increase the square footage or gross leaseable area of the improvements on the Property if any of the expenses in connection therewith are paid or incurred by Mortgage Borrower; (b) materially change the method of conducting the business of Mezzanine Borrower or Mortgage Borrower; (c) settle any claim asserted in an amount greater than One Hundred Thousand Dollars ($100,000.00); (d) enter into any contract (or series of contracts with the same Person and/or its Affiliates) for an aggregate amount greater than Fifty Thousand Dollars ($50,000.00), except as permitted by the Approved Budget; (e) make any determination to restore the Property after a casualty or condemnation, or (f) incur any extraordinary operating expense payable to a bona fide third party that is not set forth in an approved Annual Budget or incur any expense which is payable to an Affiliate of Mortgage Borrower. In seeking Mezzanine Lender's approval in connection with any of the foregoing, Mezzanine Borrower shall submit to Mezzanine Lender a reasonably detailed explanation of the proposed action it proposes to take.

Section 6.7. <u>Mezzanine Lender's Expenses</u>. Mezzanine Borrower shall, whether or not the transactions contemplated by this Agreement and the other Mezzanine Loan Documents are consummated, pay all of Mezzanine Lender's transaction costs, which shall include, without limitation, all out-of-pocket fees, costs, expenses, and disbursements of Mezzanine Lender and its attorneys (including local counsel), Servicer, accountants and other contractors in connection with: (i) the negotiation, preparation, execution and delivery of the Mezzanine Loan Documents and the documents and instruments referred to therein, (ii) the creation, perfection or protection of Mezzanine Lender's liens and security interests in the Pledged Collateral (including, without limitation, fees and expenses for title and lien searches and filing and recording fees, intangibles taxes, personal property taxes, due diligence expenses, travel expenses, and accounting firm fees), (iii) the negotiation, preparation, execution and delivery of any amendment, waiver or consent relating to any of the Mezzanine Loan Documents, and (iv) the preservation of rights

under and enforcement of the Mezzanine Loan Documents and the documents and instruments referred to therein, including, without limitation, any restructuring or rescheduling of the Outstanding Loan Obligations.

Section 6.8. <u>Senior and Mezzanine Lender Notices</u>. Mezzanine Borrower shall promptly submit to Mezzanine Lender true, correct and complete copies of all notices, documents, instruments, or agreements that Mezzanine Borrower or Mortgage Borrower shall receive from or submit to Senior Lender. All such documents, instruments or agreements, and any actions or omissions which require the review and/or approval of both Senior Lender and Mezzanine Lender, shall be submitted to and approved (subject to the Intercreditor Agreement) by Mezzanine Lender prior to being submitted to Senior Lender for review and approval. Mezzanine Borrower shall promptly notify Mezzanine Lender in the event Senior Lender withholds its approval from any request for consent or approval submitted by Mortgage Borrower, together with a detailed explanation of Senior Lender's reasons for withholding such approval. Mezzanine Borrower shall resubmit its revised request to Senior Lender only after consultation (and approval as required herein) by Mezzanine Lender of such request.

ARTICLE VII

<u>DEFAULTS</u>

Section 7.1. <u>Event of Default</u>. The term "<u>Default</u>" as used herein shall mean any one or more of the events set forth below prior to the expiration of the applicable notice or grace period, if any. The term "<u>Event of Default</u>", wherever used in this Agreement, shall mean any one or more of the events set forth below after the expiration of the applicable notice or grace period, if any.

7.1.1. if Mezzanine Borrower shall fail to make in full any payment of principal or interest due under the Mezzanine Loan Documents, or if Mezzanine Borrower or any other Loan Party shall fail to pay in full any other amount due and owing under the Mezzanine Loan Documents, in either case when due and payable in accordance with Mezzanine Loan Documents;

7.1.2. if Mezzanine Borrower or any other Loan Party shall fail to perform or be in breach of any of the other obligations, agreements, undertakings, terms, covenants, provisions or conditions of this Agreement, or the other Mezzanine Loan Documents, not otherwise referred to in this <u>Section 7.1</u>, for ten (10) days after written notice to Mezzanine Borrower from Mezzanine Lender;

7.1.3. the occurrence of a Senior Loan Event of Default;

7.1.4. if any representation or warranty made herein or in any other Mezzanine Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by or on behalf of Mezzanine Borrower in connection with this

Agreement, or any other Mezzanine Loan Document shall be false in any material respect as of the date such representation or warranty was made or remade;

7.1.5. the entry by a court of (a) a decree or order for relief in respect of any Loan Party in an involuntary case or proceeding under any applicable federal or state bankruptcy, insolvency, reorganization or other similar law; or (b) a decree or order adjudging any Loan Party a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of any Loan Party under any applicable federal or state bankruptcy, insolvency, reorganization or other similar law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of any Loan Party or of any substantial part of the property of any Loan Party, or ordering the winding up or liquidation of the affairs of any Loan Party, and the continuance of any such decree or order for relief or any such other decree or order unstayed and in effect for a period of sixty (60) days;

7.1.6. (a) the commencement by any Loan Party of a voluntary case or proceeding under any applicable federal or state bankruptcy, insolvency, reorganization or other similar law, or of any other case or proceeding, to be adjudicated a bankrupt or insolvent; (b) the consent by any Loan Party (i) to the entry of a decree or order for relief in respect of Mezzanine Borrower or such Loan Party in an involuntary case or proceeding under any applicable federal or state bankruptcy, insolvency, reorganization or other similar law, or (ii) to the commencement of any bankruptcy or insolvency case or proceeding against Mezzanine Borrower or such other Loan Party; (c) the filing by any Loan Party of a petition or answer or consent seeking reorganization or relief under any applicable federal or state bankruptcy, insolvency, reorganization or other similar law; (d) the consent by any Loan Party to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or similar official of any Loan Party, or of any substantial part of any property of any Loan Party; (e) the making by any Loan Party of an assignment for the benefit of creditors; or (f) the admission by any Loan Party in writing of its inability to pay its debts generally as they become due;

7.1.7. if any provision of any Organizational Document of Mezzanine Borrower or Mortgage Borrower is amended or modified in any respect without the consent of Mezzanine Lender, or if any Loan Party fails to perform or enforce the provisions of such Organizational Documents or attempts to dissolve;

7.1.8. if Mezzanine Borrower or any other Loan Party shall fail to provide any of the statements or other materials referred to in Section 6.1 or to process a proposed Annual Budget in accordance with Section 6.2 as and when required, or if Mezzanine Lender or its representatives is prevented from inspecting Mezzanine Borrower's and/or Mortgage Borrower's books and records upon request; or

7.1.9. if any breach of Section 5.1.6, Section 5.1.13, Section 6.4, Section 8.20 or Section 8.21 shall occur.

- 58 -

Section 7.2.  <u>Remedies</u>.

7.2.1. The occurrence of an Event of Default under this Agreement shall constitute an Event of Default under all of the other Mezzanine Loan Documents.  Upon the occurrence of any Event of Default, Mezzanine Borrower agrees that Mezzanine Lender may (but without any obligation to do so) take such action, without notice or demand, as Mezzanine Lender deems advisable to protect and enforce its rights against Mezzanine Borrower and in and to the Collateral, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Mezzanine Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Mezzanine Lender (and any and all costs and expenses, including legal fees and other professional fees, paid or incurred by Mezzanine Lender in connection with the following shall constitute a protective advance and shall be payable on demand):

(a) declare the entire unpaid Outstanding Loan Obligations to be immediately due and payable; <u>provided, however,</u> that if any Event of Default as described in <u>Section 7.1.5</u> or <u>Section 7.1.6</u> shall occur, the entire unpaid Outstanding Loan Obligations shall be automatically due and payable, without any further notice, demand or other action by Mezzanine Lender;

(b) institute proceedings, judicial or otherwise, or take any other action, for the enforcement of Mezzanine Lender's rights under the Mezzanine Loan Documents or at law or in equity, including, without limitation, the foreclosure or sale of the Collateral or any portion thereof;

(c) terminate, in whole or in part, any obligation Mezzanine Lender may have to make any advance hereunder or approve any advance under the Senior Loan, or to release any Collateral or approve any release of the Property under the Senior Loan;

(d) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained in the Mezzanine Loan Documents;

(e) recover judgment on the Mezzanine Note either before, during or after any proceedings for the enforcement of the Mezzanine Loan Documents;

(f) exercise any and all rights and remedies granted to a secured party upon default under the applicable Uniform Commercial Code;

(g) exercise all or any one or more of the rights, powers and other remedies available to Mezzanine Lender against any of the Loan Parties under the Mezzanine Loan Documents, at law or in equity, at any time and from time to time, whether or not all or any portion of the Outstanding Loan Obligations shall be declared due and payable, and whether or not Mezzanine Lender shall have commenced any foreclosure proceedings or other action for the

enforcement of its rights and remedies under any of the Mezzanine Loan Documents with respect to the Collateral;

(h) take any action which, in Mezzanine Lender's sole judgment, is necessary or appropriate to effect observance and performance of the covenants, agreements and obligations (under this Agreement and the other Mezzanine Loan Documents) of Mezzanine Borrower or any other Person providing Collateral pursuant to, or obligated to perform any of the terms and provisions of, this Agreement or the other Mezzanine Loan Documents;

(i) apply any sums then deposited in the Mezzanine Cash Collateral Account, the Interest Reserve, the Impound Account and/or any other sums held in escrow or as collateral or otherwise by Mezzanine Lender in accordance with the terms the Mezzanine Loan Documents to the payment of the Outstanding Loan Obligations in such order of payment as Mezzanine Lender shall in its sole and absolute discretion elect;

(j) pay, perform, or cause the performance of (provided Mezzanine Lender shall have no obligation to do so) such covenant or obligation, including completing the construction of the Project or any portion thereof; and

(k) pursue such other remedies and rights as Mezzanine Lender may have under applicable law or at equity.

7.2.2. Proceeds. The proceeds of any disposition of the Collateral, or any part thereof, or any other sums collected by Mezzanine Lender pursuant to the Mezzanine Loan Documents, may be applied by Mezzanine Lender to the payment of the Outstanding Loan Obligations in such priority and proportions as Mezzanine Lender in its discretion shall deem proper.

7.2.3. Mezzanine Lender Action. Upon the occurrence of any Event of Default, Mezzanine Lender may, but without any obligation to do so and without notice to or demand on Mezzanine Borrower or any other Loan Party and without releasing Mezzanine Borrower or any other Loan Party from any Obligation, take any action in such manner and to such extent as Mezzanine Lender may deem necessary to protect the Collateral and/or take any action to cure any Event of Default, including, without limitation, any default under the Senior Loan. Mezzanine Borrower, for itself and on behalf of each of the other Loan Parties, agrees that Mezzanine Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring an action or proceeding to protect its interest in the Property or to collect the Outstanding Loan Obligations, and the cost and expense thereof (including, without limitation, legal fees), shall constitute a protective advance and shall be payable on demand.

7.2.4. No Cure. Mezzanine Lender's or Senior Lender's exercise of any right or remedy which has the effect of remedying an Event of Default under the Mezzanine Loan Documents or any default under the Senior Loan Documents shall not constitute a cure or waiver of such Event of Default.

       7.2.5. <u>Senior Loan</u>. Mezzanine Lender's remedies under this subsection shall be in addition to Mezzanine Lender's rights relating to the Senior Loan Documents set forth in this Agreement.

       7.2.6. <u>No Waiver by Mezzanine Lender</u>. The failure of Mezzanine Lender to insist upon strict performance of any term, covenant or condition contained herein or in the Mezzanine Loan Documents shall not be deemed to be a waiver thereof. Mezzanine Borrower shall not be relieved of any obligations by reason of (a) the failure of Mezzanine Lender to comply with any request of any Loan Party to take any action to enforce any of the provisions hereof or any other Mezzanine Loan Document, (b) the release, regardless of consideration, of the whole or any part of the Collateral or of any Person liable for the Outstanding Loan Obligations or any portion thereof, or (c) any agreement or stipulation by Mezzanine Lender extending the time of payment or otherwise modifying or supplementing the terms of the Mezzanine Loan Documents. Mezzanine Lender may resort for the payment of the Outstanding Loan Obligations to any Collateral held by Mezzanine Lender in such order and manner as Mezzanine Lender, in its discretion, may elect. Mezzanine Lender may take action to recover the Outstanding Loan Obligations, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Mezzanine Lender thereafter to recover against the Collateral under the Mezzanine Loan Documents. The rights of Mezzanine Lender under each of the Mezzanine Loan Documents shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Mezzanine Lender shall be construed as an election to proceed under any one provision of any Mezzanine Loan Document to the exclusion of any other provision. Mezzanine Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

       7.2.7. <u>Waiver</u>. Mezzanine Borrower, for itself and for all others who are or may become liable for the payment of all or any part of the Outstanding Loan Obligations, hereby severally waives all rights of exemption of property from levy or sale under execution or other process for the collection of debts under the Constitution or laws of the United States or any State thereof; and any further receipt by Mezzanine Lender or acknowledgment by Mezzanine Lender of any collateral now or hereafter deposited as security for the Mezzanine Loan.

ARTICLE VIII

<u>MISCELLANEOUS</u>

   Section 8.1.   <u>Interest Rate Limitation</u>. Notwithstanding anything herein, in the Mezzanine Note or in any of the other Mezzanine Loan Documents to the contrary, no provision contained herein or therein which purports to obligate Mezzanine Borrower to pay any amount of interest or any fees, costs or expenses which are in excess of the maximum permitted by applicable Legal Requirements, shall be effective to the extent it calls for the payment of any interest or other amount in excess of such maximum. All agreements between Mezzanine Borrower and Mezzanine Lender, whether now existing or hereafter arising and whether written

or oral, are hereby limited so that in no contingency, whether by reason of demand for payment or acceleration of the maturity hereof or otherwise, shall the interest contracted for, charged or received by Mezzanine Lender exceed the maximum amount permissible under applicable Legal Requirements. If, from any circumstance whatsoever, interest would otherwise be payable to Mezzanine Lender in excess of the maximum lawful amount, the interest payable to Mezzanine Lender shall be reduced to the maximum amount permitted under applicable Legal Requirements; and if from any circumstance Mezzanine Lender shall ever receive anything of value deemed interest by applicable Legal Requirements in excess of the maximum lawful amount, an amount equal to any excessive interest shall, at the option of Mezzanine Lender, be refunded to Mezzanine Borrower or be applied to the reduction of the Outstanding Loan Obligations (excluding interest) or, if such excessive interest exceeds the unpaid balance of the Outstanding Loan Obligations (excluding interest), such excess shall be refunded to Mezzanine Borrower. This paragraph shall control all of the Mezzanine Loan Documents.

Section 8.2.   <u>Entire Agreement</u>.  This Agreement, together with the Exhibits hereto and the other Mezzanine Loan Documents, constitutes the entire agreement among the parties hereto with respect to the subject matter contained in this Agreement, the Exhibits hereto and the other Mezzanine Loan Documents and supersedes all prior agreements, understandings and negotiations between the parties.

Section 8.3.   <u>Closing</u>.  This Mezzanine Loan shall close on the Effective Date.

Section 8.4.   <u>Governing Law; Service of Process; Waivers</u>.

8.4.1.   This Agreement shall be deemed to be a contract under the laws of the State of New York and for all purposes shall be governed by and construed and enforced in accordance with the laws of New York, without regard to its conflict of laws principles except those contained in Section 5-1401 of the New York General Obligations Law.

8.4.2.   All actions or proceedings arising in connection with the Mezzanine Loan Documents (including, without limitation, this Agreement) shall be tried and litigated in state or Federal courts located in the State of New York pursuant to Section 5 1402 of the New York General Obligations Law, except as otherwise required pursuant to the Mezzanine Mortgage and the Mezzanine Assignment of Leases and unless such actions or proceedings are required to be brought in another court to obtain subject matter jurisdiction over the matter in controversy. **MEZZANINE BORROWER WAIVES ANY RIGHT IT MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON-CONVENIENS, TO ASSERT THAT IT IS NOT SUBJECT TO THE JURISDICTION OF SUCH COURTS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE HEREWITH.**

8.4.3.   **IN ANY ACTION AGAINST MEZZANINE BORROWER, SERVICE OF PROCESS MAY BE MADE UPON MEZZANINE BORROWER BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO MEZZANINE BORROWER'S ADDRESS ABOVE SET FORTH, WHICH SERVICE**

SHALL BE DEEMED SUFFICIENT FOR PERSONAL JURISDICTION AND SHALL BE DEEMED EFFECTIVE THREE (3) DAYS AFTER MAILING. Mezzanine Borrower hereby irrevocably appoints Adorno & Yoss LLP, 2525 Ponce de Leon Boulevard, Suite 400, Miami, Florida 33134-6012 (the "Process Agent"), to receive for and on behalf of Mezzanine Borrower service of process on behalf of Mezzanine Borrower relating to the Mezzanine Loan Documents (including, without limitation, this Agreement). SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING AGAINST MEZZANINE BORROWER MAY BE MADE ON THE PROCESS AGENT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY ANY OTHER METHOD OF SERVICE PROVIDED FOR UNDER APPLICABLE LAWS IN EFFECT IN THE STATE OF NEW YORK, AND THE PROCESS AGENT IS HEREBY AUTHORIZED AND DIRECTED TO ACCEPT SUCH SERVICE FOR AND ON BEHALF OF MEZZANINE BORROWER AND TO ADMIT SERVICE WITH RESPECT THERETO. SUCH SERVICE UPON THE PROCESS AGENT SHALL BE DEEMED EFFECTIVE PERSONAL SERVICE ON MEZZANINE BORROWER SUFFICIENT FOR PERSONAL JURISDICTION FIVE (5) DAYS AFTER MAILING, AND SHALL BE LEGAL AND BINDING UPON MEZZANINE BORROWER FOR ALL PURPOSES, NOTWITHSTANDING ANY FAILURE OF THE PROCESS AGENT TO MAIL COPIES OF SUCH LEGAL PROCESS TO MEZZANINE BORROWER, OR ANY FAILURE ON THE PART OF MEZZANINE BORROWER TO RECEIVE THE SAME. Mezzanine Borrower confirms that Mezzanine Borrower has instructed the Process Agent to mail to Mezzanine Borrower, upon service of process being made on the Process Agent pursuant hereto, a copy of the summons and complaint or other legal process served upon it by registered mail, return receipt requested, at Mezzanine Borrower's address hereinabove set forth, or to such other address as Mezzanine Borrower may notify the Process Agent in writing. Mezzanine Borrower agrees that Mezzanine Borrower will at all times maintain a process agent to receive service of process in the State of New York on Mezzanine Borrower's behalf with respect to this Agreement. If for any reason the Process Agent or any successor thereto shall no longer serve as such process agent or shall have changed its address without notification thereof to Mezzanine Lender, Mezzanine Borrower immediately after gaining knowledge thereof, irrevocably shall appoint a substitute process agent acceptable to Mezzanine Lender in the State of New York and advise Mezzanine Lender thereof. Nothing hereinabove contained shall preclude Mezzanine Lender from bringing any action or proceeding arising out of or relating to the Mezzanine Note in the courts of any place where Mezzanine Borrower or any of its assets may be founded or located.

8.4.4. MEZZANINE BORROWER HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY MEZZANINE LENDER UNDER THE MEZZANINE LOAN DOCUMENTS (INCLUDING, WITHOUT LIMITATION, THIS AGREEMENT), ANY AND EVERY RIGHT MEZZANINE BORROWER MAY HAVE TO (a) INJUNCTIVE RELIEF, (b) INTERPOSE ANY COUNTERCLAIM THEREIN (EXCEPT FOR ANY COMPULSORY COUNTERCLAIM WHICH, IF NOT ASSERTED IN SUCH PROCEEDING, WOULD BE WAIVED), AND (c) HAVE THE SAME