(b) A certification by Mezzanine Borrower, in form reasonably satisfactory to Mezzanine Lender, that the Condominium Documents fully and accurately disclose all matters required to be disclosed by Legal Requirements.

(c) Evidence that Senior Lender has approved the Prospectus, and Condominium Documents, and has agreed either to join in the execution of the Condominium Documents to be recorded or to execute, with the requirements for deed, and record, a consent to such Condominium Documents or an agreement subordinating the lien of the Senior Loan Documents to such Condominium Documents.

9.1.3. Mezzanine Borrower shall deliver to Mezzanine Lender, for Mezzanine Lender's review and approval, at least seven (7) Business Days prior to the filing thereof with the Division, a copy of the form of the notice of intended conversion to the tenants of the Property, in compliance with all Legal Requirements (the "Termination Notice"), informing such tenants of the planned Condominium Conversion, subject to any statutory rights of such tenants to purchase Units or extend the term of their leases pursuant to the Florida Roth Act (any tenant exercising such a statutory extension right is referred to as an "Extending Tenant"). Within two (2) Business Days after obtaining Mezzanine Lender's approval thereof, Mezzanine Borrower shall file the form of Termination Notice approved by Mezzanine Lender with the Division and, promptly after the approval thereof by the Division (but in no event later than five days after the earliest date the Termination Notice is permitted to be delivered under applicable Legal Requirements), shall deliver the Termination Notice to all tenants of the Property entitled to receive the same in compliance with the Legal Requirements therefor. Mezzanine Borrower shall not increase (or permit Mortgage Borrower to increase) the rights offered to tenants beyond the statutory minimum. Mezzanine Borrower shall deliver to Mezzanine Lender, within two (2) Business Days after receipt, copies of any and all communications with the Division, including, without limitation, any communiqués from the Division requiring the Mezzanine Borrower to disclose or repair certain conditions at the Property.

9.1.4. Mezzanine Borrower shall comply with all Legal Requirements relating to the Condominium Documents and will submit to the applicable Governmental Authorities and buyers, if applicable, in a timely fashion subject to the terms of this Agreement, any required amendments to the Condominium Documents and will thereafter keep the Condominium Documents in effect continuously for so long as any Units remain unsold or the Loan remains outstanding. Mezzanine Borrower will not, without the prior written consent of Mezzanine Lender in each instance, modify, amend, supplement or terminate any Condominium Documents (nor shall Mezzanine Borrower permit Mortgage Borrower to do any of the foregoing).

9.1.5. Mezzanine Borrower shall achieve the benchmarks (the "Condominium Benchmarks") set forth on Exhibit D attached hereto for (a) the Condominium Conversion and commencement of sales of Units, (b) receipt of Approved Sales Contracts for Units (which shall not be subject to any statutory right of rescission or such right shall have expired unexercised), and (c) consummation of sales of Units pursuant to Approved Sales Contracts.

9.1.6. If required by Mezzanine Lender, Mezzanine Borrower shall execute promptly and deliver to Mezzanine Lender modifications of the Mezzanine Loan Documents required by Mezzanine Lender to reflect the Condominium Conversion and provide for or confirm the liens and security interests required by Mezzanine Lender, all in form and substance satisfactory to Mezzanine Lender.

9.1.7. Mezzanine Borrower shall pay on demand all costs incurred by Mezzanine Lender (including, without limitation, reasonable attorney's fees and disbursements) in connection with the Condominium Conversion and/or Mezzanine Lender's review of the Condominium Documents.

Section 9.2.   <u>Sales of Units</u>.

9.2.1. Subject to the terms and conditions set forth herein, Mezzanine Borrower may enter into contracts for the sale of Units provided that Mezzanine Borrower has received authorization to do so from the Division and each of said contracts is in full compliance with the terms and conditions hereof and with the terms and provisions of the Prospectus and the other Condominium Documents, and provided all of the following conditions shall have been satisfied (each such contract complying with the terms hereof shall be referred to herein as an "<u>Approved Sales Contract</u>"):

(a)   such Approved Sales Contract is with a bona fide purchaser of a Unit who is not an Affiliate of any Loan Party (a "<u>Contract Vendee</u>") and provides for a purchase price (less any sum payable for upgrades or extras) equal to or exceeding the Minimum Release Consideration;

(b)   no Contract Vendee shall enter into an Approved Sales Contract for more than two (2) Units without the prior written consent of the Mezzanine Lender;

(c)   each Approved Sales Contract must provide for an "all cash sale" (it being understood that if a Unit is financed by a third party, same shall constitute an "all cash sale"), payable in full by bank or certified check or wire transfer of immediately available funds at closing;

(d)   the Approved Sales Contract shall not materially deviate from the form contract of sale which was part of the Prospectus, submitted by Mezzanine Borrower to, and approved in writing by, Mezzanine Lender and the Division;

(e)   Mezzanine Borrower shall deliver to Mezzanine Lender a true and correct copy of each Approved Sales Contract together with a summary of such Approved Sales Contract (such summary to be in a form reasonably approved by Mezzanine Lender), in each case within five (5) days after the execution of the Approved Sales Contract;

(f)   the Approved Sales Contract shall require the Contract Vendee to deposit with the escrow agent a cash amount equal to not less than five percent (5%) of the

purchase price set forth in such contract, and shall provide that such amount shall be retained by Mortgage Borrower as liquidated damages upon default beyond all applicable grace, notice and cure periods by the Contract Vendee of its purchase obligation under such Approved Sales Contract;

(g)  the Approved Sales Contract shall be subject to no conditions (other than financing contingencies) upon the Contract Vendee's obligation (except for customary title conditions and rights of rescission required by law); and

(h)  under no circumstances may Mezzanine Borrower or Mortgage Borrower convey any Units to the condominium association established in conjunction with the Condominium Conversion without the prior written consent of Mezzanine Lender.

9.2.2. Mezzanine Borrower will not, without the prior written consent of Mezzanine Lender in each instance, modify, amend, supplement or terminate (except in the case of default by the Contract Vendee thereunder) any Approved Sales Contract (nor shall Mezzanine Borrower permit Mortgage Borrower to do any of the foregoing).

9.2.3. Mezzanine Borrower will promptly notify Mezzanine Lender of all matters of which Mezzanine Borrower or Mortgage Borrower has received notice, or has been placed on inquiry which may indicate, that a default by Mortgage Borrower under, or variance from, or noncompliance with any Approved Sales Contract or Condominium Document exists or is about to occur and Mezzanine Borrower will do all such acts and undertake all such steps and institute all such proceedings as shall be necessary to cure or avert such default or variance and will promptly forward to Mezzanine Lender any notices Mezzanine Borrower or Mortgage Borrower receives in regard to any of the foregoing matters.

9.2.4. Any sale of a Unit shall (a) be in full compliance with all applicable Legal Requirements, including, without limitation, the Florida Condominium Act, the Magnuson-Moss Warranty Act, the Federal Reserve Board Regulations "B" (Equal Credit Opportunity Act) and "Z" (Truth in Lending), the Interstate Land Sales Full Disclosure Act and the Department of Housing and Urban Development Regulation "X" (RESPA), (b) not be considered the sale of a security under the Securities Act of 1933, and (c) be in compliance with the Condominium Documents.

9.2.5. All deposits made by purchasers of Units shall be deposited into an escrow account with an escrow agent, authorized to act as such under the laws of the State of Florida and acceptable to Mezzanine Lender in its discretion, pursuant to an escrow agreement acceptable to Mezzanine Lender in all respects and in accordance with all applicable Legal Requirements. As additional security for the Mezzanine Loan, Mezzanine Borrower shall cause Mortgage Borrower to assign to Mezzanine Lender (subject to the Senior Loan Documents if the Conversion Event has not occurred) all of its rights under the escrow agreement and to the sums on deposit pursuant thereto. Subject to the remaining terms of this Section 9.2, Mezzanine Borrower shall not release or use (or permit Mortgage Borrower to release or use) any such deposits or any portion thereof for costs incurred in connection with the construction of any

improvements or for any other purposes, it being the intent that the full amount of each deposit shall be held in escrow until such time as (a) the Unit with respect to which the same has been deposited has been conveyed to a Contract Vendee in accordance with the Mezzanine Loan Documents, or (b) the Contract Vendee thereunder properly cancelled its Approved Sales Contract (in which case such deposit shall be refunded to the Contract Vendee), or (c) the Contract Vendee has defaulted and Mortgage Borrower is entitled to same (in which case such sum, to the extent of Mortgage Borrower's rights in same, shall promptly be deposited into the Senior Lockbox or, if not required to be deposited in the Senior Lockbox, in the Mezzanine Cash Collateral Account). Notwithstanding the foregoing, if an Approved Sales Contract provides for so-called purchaser "upgrades" or "extras", any amount deposited with Mortgage Borrower therefor by the applicable Contract Vendee which is in excess of the ten percent (10%) deposit required hereby may be used by Mortgage Borrower for paying for the actual third party costs of such upgrades (i.e., less profits to the Loan Parties and their affiliates) (such amount, the "Net Upgrade Cost"), provided that such additional sums shall, at Mezzanine Lender's request, be deposited with Mezzanine Lender and held by Mezzanine Lender as security for the Mezzanine Loan pursuant to a cash collateral security agreement (in form and substance satisfactory to Mezzanine Lender), which agreement shall provide, among other things, that such monies may (and, provided no default exists under the Mezzanine Loan Documents, shall) be released by Mezzanine Lender, from time to time, to Mezzanine Borrower for the purpose of paying such Net Upgrade Costs upon satisfaction of such conditions as Mezzanine Lender shall reasonably require.

9.2.6. Mezzanine Borrower shall cause Mortgage Borrower to assign to Mezzanine Lender, as further security for the payment of the Mezzanine Loan, all contracts of sale executed by Mortgage Borrower in connection with the sale of any Unit and Mortgage Borrower's rights to any deposits and down payments received pursuant thereto, and Mezzanine Borrower shall deliver to Mezzanine Lender an executed counterpart of any such contract. Nothing contained in the foregoing sentence shall be construed to bind Mezzanine Lender to the performance of any other covenants, conditions or provisions contained in any such contract of sale (whether or not it shall constitute an Approved Sales Contract) or otherwise to impose any obligation on Mezzanine Lender except that Mezzanine Lender shall be accountable for money actually received by Mezzanine Lender pursuant to such assignment;

9.2.7. All expenses incurred by Mezzanine Lender with respect to Unit sales and releases (including, without limitation, the reasonable fees and disbursements of Mezzanine Lender's counsel) shall be paid by Mezzanine Borrower.

9.2.8. Mezzanine Borrower shall not permit Mortgage Borrower to convey any Unit except upon satisfaction of each of the conditions set forth in this Section 9.2.8. Upon the conveyance of a Unit, Mezzanine Lender shall at the closing of such conveyance release the Unit conveyed from the lien of the Mezzanine Mortgage (if then of record) and any other Mezzanine Loan Document upon Mezzanine Borrower's or Mortgage Borrower's satisfaction of each of the following conditions:

(a) No Event of Default shall then exist and be continuing;

(b) Mezzanine Borrower shall have complied with, and shall cause Mortgage Borrower to comply with, the provisions of Section 9.2.10 hereof;

(c) Mezzanine Lender shall receive not less than two (2) Business Days' prior written notice of each proposed closing of the sale of any Unit, which notice shall, for each Unit proposed to be released, (i) specifically identify the Unit to be released, the purchase price, the Release Consideration, itemized Unit Sales Expenses, any portion of the Sale's Agent's fees which is being deferred, any portion of the purchase price applicable to upgrades or extras, and the proposed closing date, and (ii) include a copy of the Approved Sales Contract (if not previously delivered to Mezzanine Lender) and the closing statement (certified to be true, correct and complete by Mezzanine Borrower) with respect to such Unit sale, provided that such closing statement need not contain information regarding the purchase money financing for the purchaser of the applicable Unit, and (iii) include drafts of all release documentation requested of Mezzanine Lender, in a form previously approved by Mezzanine Lender; Mezzanine Lender shall have the right to be represented at such closings, at the cost and expense of Mezzanine Borrower;

(d) contemporaneously with such release there shall be a sale of such Unit pursuant to an Approved Sales Contract;

(e) the Unit to be released will constitute one or more tax lots separate and distinct from the tax lot or lots applicable to the remaining portion of the Property encumbered by the lien of the Mezzanine Mortgage;

(f) neither the release from the lien of the Mezzanine Mortgage, nor the conveyance to the transferee of such Unit, will violate any applicable zoning or subdivision laws;

(g) The Release Consideration payable in respect to such Unit shall have been received, in immediately available funds, in either the Senior Lockbox maintained by the Senior Lender or the Mezzanine Cash Collateral Account; and

(h) Mezzanine Lender shall have received such other documents, certificates, instruments, opinions or assurances as Mezzanine Lender may reasonably request.

9.2.9. "Release Consideration" shall mean, in respect of each Unit sold and conveyed, the greater of (a) the Minimum Release Consideration of such Unit and (b) the Net Sales Proceeds generated by the sale of such Unit. Notwithstanding anything contained herein to the contrary, upon the occurrence of an Event of Default, "Release Consideration" shall, at Mezzanine Lender's option, mean, in respect of each Unit sold thereafter, one hundred percent (100%) of the gross sales proceeds for such Unit. "Minimum Release Consideration" shall mean, with respect to each Unit sold and conveyed, the minimum release consideration amount allocated to such Unit on Exhibit E attached hereto during the period that the Senior Loan

remains outstanding and, thereafter, upon repayment of the Senior Loan in full, the minimum release consideration amount allocated to such Unit shall be ninety-four percent (94%) of the gross sales proceeds for each such Unit and Mezzanine Borrower shall deliver a new minimum release consideration schedule to replace <u>Exhibit E</u>, which shall be delivered to Mezzanine Lender no later than thirty (30) days prior to repayment of the Senior Lender and approved by Mezzanine Lender. "<u>Net Sales Proceeds</u>" shall mean, with respect to each Unit conveyed, the gross consideration payable in respect of such Unit (including all customary adjustments to the purchase price, but excluding the expenses contemplated and all consideration payable to Mortgage Borrower and its Affiliates) less the reasonable and customary expenses of sale thereof approved by Mezzanine Lender ("<u>Unit Sales Expenses</u>"), provided that Unit Sales Expenses, including brokerage commissions, shall in no event exceed six percent (6%) of the gross sales price of each such Unit. Expenses payable to any Loan Party, Sales Agent or any Affiliates of any Loan Party or Sales Agent, shall not be considered reasonable and customary expenses for purposes of computing Net Sales Proceeds, provided that, so long as no Management Event has occurred and is continuing, Unit Sales Expenses may include: (a) the portion of Sales Agent's fee approved by Mezzanine Lender for payment to individual sales employees of Sales Agent and Sales Agent's unreimbursed expenses, not to exceed, in the aggregate, two and one half percent (2.5%) of the gross sales price of each Unit (the "<u>Sales Agent Cap</u>") and (b) the Net Upgrade Cost. The Release Consideration paid to Mezzanine Lender shall be applied in accordance with the Mezzanine Cash Management Agreement. Notwithstanding anything to the contrary contained herein, after the occurrence and during the continuance of an Event of Default, the Release Consideration paid to Mezzanine Lender shall be applied against the Outstanding Loan Obligations in such order of priority as Mezzanine Lender shall elect. Notwithstanding the foregoing, to the extent that the Sales Agent only receives the Sales Agent Cap in connection with a sale of any Unit, prior to any Distributions made to Mezzanine Borrower, Mezzanine Borrower shall cause an amount equal to the difference, if any, between the Sales Agent Cap and three percent (3.0%) of the gross sales price of such Unit (a "<u>Sales Agent Differential</u>") to be paid to Sales Agent in accordance with Section 2.14.6(c)(viii) hereof.

Notwithstanding anything to the contrary contained in this Agreement, commencing on the date which is the later to occur of (i) the six month anniversary of the Effective Date, or (ii) the date on which the Senior Loan has been paid down to a total of $34,500,000 by Mortgage Borrower, Mezzanine Borrower shall pay to Mezzanine Lender fifteen percent (15%) of the Net Sales Proceeds with respect to a sale of a Unit so long as Mortgage Borrower has consummated the sale of no less than seventy-five (75) Units during a three (3) month period. So long as no Event of Default has occurred, Mezzanine Borrower and Mezzanine Lender hereby agree that for purposes of calculating the Supplemental Payment, the aforesaid fifteen percent (15%) of the Net Sales Proceeds with respect to a sale of a Unit shall be treated as a reduction toward the outstanding principal amount of the Mezzanine Loan (each payment, a "<u>Principal Reduction Payment</u>").

      9.2.10. <u>Minimum Sales for Condominium Conversion</u>. Mezzanine Borrower shall not (and shall not permit Mortgage Borrower to) record any Condominium Documents or consummate the Condominium Conversion unless Mortgage Borrower shall have at least one

hundred fifteen (115) fully executed Approved Sales Contracts (which shall not be subject to a statutory right of rescission) for Units.

9.2.11. <u>Closings for Units Subject to Extending Tenants</u>. If any Unit is occupied by an Extending Tenant and is the subject of an Approved Sales Contract (an "<u>Occupied Unit Contract</u>"), subject to the pre-sale requirement set forth in Section 9.2.10 above, Mezzanine Borrower shall cause Mortgage Borrower to consummate the sale under such Occupied Unit Contract no later than thirty (30) days after the Extending Tenant vacates such Unit.

9.2.12. <u>Final Closing Statement</u>. Within five (5) days after each closing of the conveyance of a Unit, Mezzanine Borrower shall deliver to Mezzanine Lender a true and complete copy of the closing statement (certified to be true, correct and complete by Mortgage Borrower and Mezzanine Borrower) signed by Mortgage Borrower and purchaser in respect to such Unit sale.

9.2.13. <u>Covenants Concerning the Condominium</u>. No Condominium Document shall be recorded unless Senior Lender either has joined in the execution of such Condominium Documents or has executed, with the requirements for deed, and recorded, a consent to such Condominium Documents or an agreement subordinating the lien of the Senior Loan Documents to such Condominium Documents. Upon the recording of any Condominium Documents (which recording shall not occur prior to the date specified in Section 9.1.4 above), the following covenants of Mezzanine Borrower shall become operative and in effect:

(a) None of Mortgage Borrower, Mezzanine Borrower or their designees on the board of directors (the "<u>Board</u>") of the condominium association for the Condominium shall consent to any amendment, modification or supplement to or termination of the declaration of condominium or by-laws of the Condominium, or any other Condominium Documents, without the prior written consent of Mezzanine Lender in each instance;

(b) Unless Mortgage Borrower is lawfully excused from the obligation to pay assessments and similar charges attributable to Units owned by Mortgage Borrower, Mezzanine Borrower will cause Mortgage Borrower to pay all assessments for common charges and expenses made against the portion of the Property then owned by Mortgage Borrower pursuant to the Condominium Documents, as the same shall become due and payable;

(c) Mezzanine Borrower will cause Mortgage Borrower to comply in all material respects with all of the terms, covenants and conditions on Mortgage Borrower's part to be complied with pursuant to the declaration of condominium or by-laws of the Condominium or any rules and regulations that may be adopted for the Condominium, as the same shall be in force and effect from time to time;

(d) Unless insurance proceeds or condemnation awards would otherwise be made available to Mortgage Borrower pursuant to the Senior Loan Documents or Mezzanine Borrower pursuant to the Mezzanine Loan Documents, Mezzanine Borrower will not, without the prior written consent of Mezzanine Lender, which consent shall not be unreasonably

withheld, exercise or permit Mortgage Borrower to exercise any right it may have to vote for (i) the expenditure of insurance proceeds or condemnation awards for the repair of restoration of the Property or (ii) any additions or improvements to the common elements of the Condominium, except to the extent such additions or improvements are required by law, or (iii) any borrowing on behalf of the condominium association;

(e) so long as any portion of the Mezzanine Loan is outstanding, Mezzanine Borrower shall seek Mezzanine Lender's review and obtain Mezzanine Lender's prior written approval of Mortgage Borrower's agreement (as evidenced by the actions of Mortgage Borrower's designees on the Board or by any vote of Mortgage Borrower in its capacity as a sponsor or developer of the Condominium or as a Unit owner) to any engagement of or change of managing agent and any amendment to the management agreement for the operation of the Condominium or any Units, as well as the original and any revision of any operating and/or capital budgets (provided that any manager of the Property approved by Mezzanine Lender shall be deemed to be approved for this purpose). Mezzanine Lender shall have the right to receive notice of, and attend, all meetings of the Board;

(f) Mezzanine Borrower shall take all actions as may be necessary from time to time to preserve and maintain the Property in accordance with the securities and condominium laws of the State of Florida and the rules and regulations pertaining thereto; and

(g) Mezzanine Borrower shall not, without the prior written consent of Mezzanine Lender, take (and hereby assigns to Mezzanine Lender any right it may have to take) any action to terminate any condominium property regime of the Property, withdraw the Property from the condominium laws of the State of Florida and the rules and regulations pertaining thereto, or cause a partition of the Property.

ARTICLE X

ADDITIONAL APPRECIATION INTEREST

Section 10.1. **Additional Appreciation Interest.**

10.1.1. Determination of Additional Appreciation Interest. As additional consideration for making the Mezzanine Loan, Mezzanine Borrower shall pay to Mezzanine Lender additional interest (the "Additional Appreciation Interest") equal to the following:

(a) in the event of the sale of any Unit, after (i) the Senior Loan has been paid in full, (ii) all amounts payable with respect to the Mezzanine Loan (other than the Additional Appreciation Interest) have been paid in full, and (iii) the Borrower's Equity Investment has been paid in full to Mortgage Borrower (or is being paid in full simultaneously with the sale of such Unit), the Additional Appreciation Interest shall be a payment equal to twenty percent (20%) of the Net Unit Sales Proceeds of such sale (or, if the Mezzanine

Borrower's Equity Investment is being repaid simultaneously with the sale, twenty percent (20%) of the Net Unit Sales Proceeds of such sale less the Mezzanine Borrower's Equity Investment paid to Mezzanine Borrower in connection with such sale); and

    (b) on the Maturity Date, a payment equal to twenty percent (20%) of the Mezzanine Loan Amount;

    (c) in the event of a Sale, a payment equal to twenty percent (20%) of the Net Sales Proceeds of such Sale; and

    (d) in the event of a Refinancing, a payment equal to twenty percent (20%) of the Net Refinancing Proceeds of such Refinancing.

  10.1.2. <u>Definitions</u>. For purposes of this <u>Section 10.1</u>, the following terms shall have the following meanings:

  "<u>Net Refinancing Proceeds</u>" shall mean the gross proceeds of a Refinancing less the reasonable and customary costs and expenses of such Refinancing actually incurred by Mezzanine Borrower and paid to Persons which are not Affiliates of Mezzanine Borrower, as reasonably substantiated to Mezzanine Lender, <u>provided</u>, that in no event shall the Net Refinancing Proceeds be less than zero.

  "<u>Net Sales Proceeds</u>" shall mean the value of all consideration received in connection with a Sale, including, without limitation, cash, notes, assumed indebtedness, deferred payments (contingent or otherwise), prepaid expenses and non-customary prorations in favor of the seller less the reasonable and customary costs and expenses of such Sale actually incurred by Mezzanine Borrower and paid to Persons which are not Affiliates of Mezzanine Borrower, as reasonably substantiated to Mezzanine Lender, but in no event greater than six percent (6%) of the total consideration received, <u>provided</u>, that in no event shall the Net Sales Proceeds be less than zero.

  "<u>Refinancing</u>" shall mean any refinancing or other payment of the entire Mezzanine Loan, whether by another Mezzanine Loan, by syndication, by the issuance of securities or otherwise.

  "<u>Sale</u>" shall mean any of the following: any sale, assignment, transfer, exchange or other disposition of the Property, or after the Conversion, all of the Unsold Units, or all of the ownership interests in Mezzanine Borrower, including, without limitation, any merger, consolidation, recapitalization or reorganization of Mezzanine Borrower.

  "<u>Trigger Event</u>" shall mean the occurrence of the Maturity Date, a Sale or a Refinancing.

  10.1.3. <u>Payment of Additional Appreciation Interest</u>. Mezzanine Borrower shall pay the Additional Appreciation Interest to Mezzanine Lender simultaneously with the sale of

any individual Unit or the occurrence of a Trigger Event; provided, however, that Mezzanine Borrower shall not be permitted to pay the Additional Appreciation Interest to Mezzanine Lender unless, before such payment or contemporaneously therewith, Mezzanine Borrower shall have paid to Mezzanine Lender any and all other sums due to Mezzanine Lender under this Agreement and the other Mezzanine Loan Documents; and further, provided, however that, notwithstanding anything to the contrary contained in this Agreement or any other Mezzanine Loan Document, Mezzanine Lender shall have no obligation to release, and shall not consent to the transfer of any Unit, or after a Conversion Event, release the Liens of the Mezzanine Loan Documents, or Mezzanine Borrower or any Guarantor from any of their respective obligations under any of the Mezzanine Loan Documents, unless and until Mezzanine Borrower shall have paid to Mezzanine Lender the Additional Appreciation Interest and any and all other sums due to Mezzanine Lender under this Agreement and the other Mezzanine Loan Documents.

      10.1.4. Characterization and Acknowledgment of Additional Appreciation Interest. Mezzanine Borrower expressly acknowledges and agrees that the Additional Appreciation Interest (i) shall constitute additional consideration for the Mezzanine Loan, and (ii) shall, upon payment, be the sole and exclusive property of Mezzanine Lender. Mezzanine Borrower and Mezzanine Lender acknowledge that they have bargained in good faith for the Additional Appreciation Interest and each believes the amount thereof is fair and conscionable and not subject to challenge under any applicable law.

      10.1.5. Survival. The obligations and liabilities of Mezzanine Borrower under this Article X shall survive any termination, satisfaction or assignment of this Agreement and/or the other Mezzanine Loan Documents and/or the exercise by Mezzanine Lender of any of its rights or remedies hereunder, including, but not limited to, the acquisition of the Property by foreclosure or otherwise.

      10.1.6. Notice and Existence of Trigger Events. Mezzanine Borrower shall give Mezzanine Lender at least thirty (30) day's prior written notice of any proposed Trigger Event (other than the Maturity Date), and Mezzanine Borrower shall not consummate, or permit to be consummated, any Trigger Event (other than the Maturity Date), without having given such notice. The receipt of any such notice by Mezzanine Lender, and the taking of any action by Mezzanine Lender in reliance thereon, shall not constitute (i) an acknowledgment by Mezzanine Lender as to whether the related facts constitute a Trigger Event or whether such Trigger Event is permitted under any of the Mezzanine Loan Documents, or (ii) a waiver of any of Mezzanine Lender's rights in connection therewith. The existence of a Trigger Event has shall be determined solely by Mezzanine Lender.

[Signatures commence on the following page]

IN WITNESS WHEREOF, the parties hereto, each intending to be legally bound, have caused this Mezzanine Loan Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

MEZZANINE LENDER:

**HUDSON REALTY CAPITAL FUND III LP**, a Delaware limited liability company

By: _____
  Robert Perelman
  Authorized Signatory

MEZZANINE BORROWER:

**MILLENIA LUXURY CONDOMINIUMS MEZZ, LLC**, a Delaware limited liability company

By: _____
  Eduardo Avila
  President/Assistant Secretary

IN WITNESS WHEREOF, the parties hereto, each intending to be legally bound, have caused this Mezzanine Loan Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

MEZZANINE LENDER:

HUDSON REALTY CAPITAL FUND III LP, a Delaware limited liability company

By:_____
    Robert Perelman
    Authorized Signatory

MEZZANINE BORROWER:

MILLENIA LUXURY CONDOMINIUMS MEZZ, LLC, a Delaware limited liability company

By:_____
    Eduardo Avila
    President/Assistant Secretary

STATE OF NEW YORK        )
                         ) :ss.
COUNTY OF NEW YORK       )

On the 27th day of June in the year 2005, before me, the undersigned, personally appeared Robert Perelman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

Nadine A. DePass
Notary Public, State of New York
No. 01DE6046174
Qualified in New York County
Commission Expires 9-05-06

(NOTARIAL SEAL)

My Commission Expires

STATE OF _____        )
                                ) :ss.
COUNTY OF _____       )

On the _____ day of June in the year 2005, before me, the undersigned, personally appeared Eduardo Avila, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

(NOTARIAL SEAL)

My Commission Expires

STATE OF NEW YORK         )
                          ) :ss.
COUNTY OF NEW YORK        )

On the _____ day of June in the year 2005, before me, the undersigned, personally appeared Robert Perelman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

(NOTARIAL SEAL)

My Commission Expires


STATE OF Florida          )
                          ) :ss.
COUNTY OF Dade            )

On the 23 day of June in the year 2005, before me, the undersigned, personally appeared Eduardo Avila, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

*Michelle Murga*
Notary Public

(NOTARIAL SEAL)

My Commission Expires 3/9/09

MICHELLE MURGA
Comm# DD0405220
Expires 3/9/2009
Bonded thru (800)432-4254
Florida Notary Assn., Inc

## EXHIBIT A

## INITIAL BUDGET

[See Attached Document]

**THE TRADITION**
**2005 BUDGET**                                                                                           1/19/05

451 units

| G/L Acct # | Description | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total | per Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3000 | Gross Potential Rental Income | 463,350 | 463,843 | 464,604 | 465,504 | 467,253 | 471,313 | 474,927 | 479,572 | 482,857 | 485,767 | 488,397 | 489,697 | 5,697,384 | 12,633 |
| 3002 | Premium & Corporate Rent | 3,625 | 3,625 | 3,625 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 46,875 | 104 |
| 3000-3002 | Total Gross Potential Income | 466,975 | 467,468 | 468,229 | 469,504 | 471,253 | 475,313 | 478,927 | 483,572 | 486,857 | 489,767 | 492,397 | 493,697 | 5,744,259 | 12,737 |
| CD | Less: Rent Concessions/Discounts | -37,010 | -35,415 | -28,827 | -22,278 | -21,095 | -19,360 | -18,040 | -14,715 | -11,004 | -12,867 | -8,815 | -9,467 | -238,893 | -530 |
| HU | Less: Employee/Model/Office | -3,946 | -3,742 | -3,742 | -3,742 | -3,742 | -3,492 | -3,492 | -3,492 | -3,492 | -3,492 | -3,492 | -3,492 | -43,358 | -96 |
|  | Rental Income Before Vacancy | 426,019 | 428,311 | 435,660 | 443,484 | 446,416 | 452,461 | 457,395 | 465,365 | 472,361 | 473,408 | 480,090 | 481,038 | 5,462,008 | 12,111 |
| 3203 | Less: Vacancy | -23,250 | -23,274 | -23,829 | -24,015 | -24,810 | -24,810 | -24,810 | -24,810 | -24,810 | -24,810 | -24,810 | -24,810 | -292,843 | -649 |
| 7500 | Less: Bad Debt | -2,246 | -2,258 | -2,297 | -2,337 | -2,356 | -2,386 | -2,411 | -2,451 | -2,486 | -2,491 | -2,524 | -2,529 | -28,774 | -64 |
|  | NET RENTAL INCOME | 400,523 | 402,780 | 409,534 | 417,132 | 419,250 | 425,265 | 430,174 | 438,105 | 445,066 | 446,107 | 452,756 | 453,699 | 5,140,391 | 11,398 |
| 3201 | Utility Reimbursement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3400 | Laundry | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3500 | Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3615 | Clubhouse | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 136 | 4,382 | 10 |
| 3600-3699 | Other | 23,692 | 24,717 | 24,792 | 24,967 | 26,742 | 27,597 | 27,672 | 26,997 | 26,392 | 27,247 | 26,132 | 25,817 | 312,764 | 693 |
|  | TOTAL OTHER INCOME | 24,078 | 25,103 | 25,178 | 25,353 | 27,128 | 27,983 | 28,058 | 27,383 | 26,778 | 27,633 | 26,518 | 25,953 | 317,146 | 703 |
|  | EFFECTIVE GROSS INCOME | 424,601 | 427,883 | 434,712 | 442,485 | 446,378 | 453,248 | 458,232 | 465,488 | 471,844 | 473,740 | 479,274 | 479,652 | 5,457,537 | 12,101 |
|  | OPERATING EXPENSES |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 5850 | Real Estate Taxes | 48,500 | 48,500 | 48,500 | 48,500 | 48,500 | 48,500 | 48,500 | 48,500 | 48,500 | 48,500 | 48,500 | 48,500 | 582,000 | 1,290 |
| 5400-5440 | Utilities | 14,956 | 14,953 | 14,908 | 14,905 | 14,912 | 14,913 | 14,911 | 14,910 | 14,913 | 14,917 | 14,831 | 14,846 | 178,875 | 397 |
| 5500-5550 | Payroll, Taxes, Benefits | 37,949 | 39,238 | 46,961 | 41,546 | 43,028 | 42,622 | 39,031 | 41,975 | 40,503 | 39,031 | 40,503 | 49,336 | 501,723 | 1,112 |
| 5200-5299 | Repairs & Maintenance | 25,835 | 28,317 | 28,245 | 30,672 | 39,379 | 29,866 | 30,191 | 28,550 | 28,263 | 32,600 | 26,342 | 27,634 | 356,194 | 790 |
| 5300-5306 | Office | 7,352 | 7,346 | 6,496 | 6,646 | 6,831 | 6,496 | 6,496 | 6,496 | 8,596 | 6,496 | 6,496 | 6,496 | 82,443 | 183 |
| 5307-5310 | Advertising | 6,962 | 7,132 | 7,132 | 7,132 | 7,472 | 7,608 | 9,458 | 8,211 | 7,302 | 7,438 | 7,200 | 8,982 | 92,029 | 204 |
| 5600-5602 | Insurance | 14,937 | 14,937 | 14,937 | 14,937 | 14,937 | 14,937 | 14,937 | 14,937 | 14,937 | 14,937 | 14,937 | 14,937 | 179,245 | 397 |
| 5700-5799 | Professional Fees | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 32,000 | 71 |
| 5800 | Management Fee - 4% | 16,984 | 17,115 | 17,388 | 17,699 | 17,855 | 18,130 | 18,329 | 18,620 | 18,874 | 18,950 | 19,171 | 19,186 | 218,301 | 484 |
|  | TOTAL EXPENSES | 178,575 | 182,538 | 189,567 | 187,237 | 197,914 | 184,072 | 182,853 | 183,199 | 182,888 | 183,868 | 178,980 | 191,118 | 2,222,810 | 4,929 |
|  | OTHER EXPENSES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | TOTAL OTHER EXPENSES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | TOTAL OPERATING EXPENSES | 178,575 | 182,538 | 189,567 | 187,237 | 197,914 | 184,072 | 182,853 | 183,199 | 182,888 | 183,868 | 178,980 | 191,118 | 2,222,810 | 4,929 |
|  | NET OPERATING INCOME | 246,026 | 245,344 | 245,145 | 255,247 | 248,464 | 269,176 | 275,379 | 282,289 | 288,956 | 289,872 | 300,294 | 288,535 | 3,234,727 | 7,172 |
| 5000-5199 | Replacement Reserve | 9,396 | 9,396 | 9,396 | 9,396 | 9,396 | 9,396 | 9,396 | 9,396 | 9,396 | 9,396 | 9,396 | 9,396 | 112,752 | 250 |
|  | OPERATING PROFIT | 236,630 | 235,948 | 235,749 | 245,851 | 239,068 | 259,780 | 265,983 | 272,893 | 279,560 | 280,476 | 290,898 | 279,139 | 3,121,975 | 6,922 |
| 7010 | Less: Depreciation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5900-5999 | Less: Mortgage Interest | 216,397 | 197,633 | 221,220 | 216,417 | 226,042 | 221,084 | 230,864 | 233,275 | 228,083 | 238,096 | 232,750 | 242,920 | 2,704,781 | 5,997 |
|  | NET INCOME | 20,233 | 38,315 | 14,529 | 29,434 | 13,026 | 38,696 | 35,119 | 39,618 | 51,477 | 42,380 | 58,148 | 36,219 | 417,194 | 925 |
| 7010 | Add: Depreciation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1700-1799 | Less: Mortgage Amortization | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | NET CASH FLOW | 20,233 | 38,315 | 14,529 | 29,434 | 13,026 | 38,696 | 35,119 | 39,618 | 51,477 | 42,380 | 58,148 | 36,219 | 417,194 | 925 |

## EXHIBIT B

## STRUCTURAL CHART OF MORTGAGE BORROWER AND MEZZANINE BORROWER

[See Attached Document]

# Traditions Organizational Chart



# EXHIBIT C

## LIST OF ALL SENIOR LOAN DOCUMENTS

1. Loan and Security Agreement;
2. Secured Promissory Note;
3. Mortgage and Fixture Filing;
4. Assignment of Rents (and Leases);
5. Environmental Indemnity;
6. Guaranty;
7. Assignment and Subordination of Management Agreement;
8. Assignment and Subordination of Sales Agreement;
9. Waiver of Rights Under Servicemembers Civil Relief Act
10. Formation Documents Certificate;
11. Pledge and Assignment of Cash Collateral Account (Lockbox Agreement);
12. Recognition Agreement;
13. Assignment of Project Agreements;
14. UCC Financing Statements (Fixture and SOS);
15. Assignment of Project Agreements;
16. Florida Anti-Coercion Statement;
17. Insurance Agreement;
18. Escrow Account Control Agreement;
19. Collateral Assignment of Purchase Agreements and Deposits; and with an Irrevocable Power of Attorney

Exhibit C
NYC01_84033442_7_334016_00003 6/28/2005 3:59 PM

# EXHIBIT D
## CONDOMINIUM BENCHMARKS

|   | ACTION | DEADLINE (number of days after the Effective Date or specified date) |
|---|---|---|
| 1. | Filing of Notice of Intended Conversion (the "Notice") with the Division | 5 days |
| 2. | Delivery of Draft Prospectus (including surveys) to Mezzanine Lender for consent | 30 days |
| 3. | Approval of the Notice by the Division | 40 days |
| 4. | Delivery of Notice to all tenants (meeting the definition of Termination Notice) | 45 days |
| 5. | Filing of Prospectus with the Division and Receipt of Authority to accept binding Sales Contracts for Units (the "Filing") | 60 days |
| 6. | Approval of Prospectus by the Division (the "Approval") | 150 days |
| 7. | Delivery to each tenant who for the 180 days preceding delivery of the Notice was a tenant in occupancy, the Condominium Documents, an offer to sell meeting all requirements of Section 718.612 of Florida Statutes, and the economic information required under Section 718.614 of Florida Statutes | No later than the earlier to occur of (x) 70 days and (y) 10 days after the Filing |
| 8. | Consummate Condominium Conversion and satisfaction of requirements of Section 9.2.10 hereof. | No later than the earlier to occur of (x) 150 days and (y) 10 days after the Approval |