UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No. 1:07-cv-03614-RPP/RLE

HUDSON REALTY CAPITAL FUND III LP,
HRC FUND III POOLING DOMESTIC LLC,
and HRC FUND III POOLING REIT, LLC,

      Plaintiffs and
      Counter-Defendants,

v.

MILLENIA LUXURY CONDOMINIUMS
(FLORIDA) LLC, EDUARDO AVILA and
JACK KAPLAN,

      Defendants and
      Counter-Plaintiffs.

## COUNTERCLAIM FOR DECLARATORY RELIEF AND DAMAGES, WITH JURY DEMAND

Millenia Luxury Condominiums (Florida), LLC (hereafter referred to as "Millenia"), Eduardo Avila (hereafter referred to as "Avila") and Jack Kaplan (hereafter referred to as "Kaplan"), with Millenia, Avila and Kaplan collectively referred to as the "Guarantors" or "Counter-Plaintiffs", bring this Counterclaim for Declaratory Relief and Damages against Hudson Realty Capital Fund III LP, a Delaware limited partnership (hereafter referred to as "Hudson"), HRC Fund III Pooling Domestic LLC, a Delaware limited liability company (hereafter referred to as "HRC Domestic") and HRC Fund III Pooling REIT, LLC (hereafter referred to as "HRC REIT"), with Hudson, HRC Domestic and HRC REIT being collectively referred to as the "Hudson Entities" or "Counter-Defendants", on the following grounds:

{212647.0007/N0696131_1}

## PARTIES

1. Millenia is a Florida limited liability company having its principal place of business located in Miami-Dade County, Florida.

2. Avila is an individual who is a resident and citizen of Miami-Dade County, Florida.

3. Kaplan is an individual who is a resident and citizen of Miami-Dade County, Florida.

4. Hudson is a Delaware limited partnership having a principal place of business in New York, New York.

5. HRC Domestic is a Delaware limited liability company having its principal place of business in New York, New York.

6. HRC REIT is a Delaware limited liability company having its principal place of business in New York, New York.

7. On or about June 28, 2005, the Plaintiffs (as Guarantors) executed a document entitled "Guarantee Agreement" in favor of Hudson as lender. A true and correct copy of the Guarantee Agreement is attached to the Complaint.

8. The Guarantee Agreement related to the purported guarantee by the Guarantors of the obligations of Millenia Luxury Condominiums Mezz LLC (hereafter "Mezzanine Borrower") to Hudson as Mezzanine Lender (as defined in the Guarantee Agreement). A true and correct copy of the Mezzanine Loan Agreement, dated as of June 28, 2005, is attached to the Complaint.

9. In connection with the Mezzanine Loan Agreement, Hudson made a mezzanine loan in the amount of $13,400,000 to the Mezzanine Borrower.

10. At the time of the execution of the Mezzanine Loan Agreement and the effecting of the loan, the Mezzanine Borrower owned 100% of the equity interests of Millenia Luxury

Condominiums LLC (hereafter referred to as "the Project Owner"). The Project Owner was to acquire the property for the conversion to a condominium project in Orange County, Florida (hereafter referred to as the "Condo Project").

11. Avila and Kaplan are indirect principals of Millenia.

12. In connection with the aforesaid Mezzanine Loan, the Mezzanine Borrower entered into a Pledge and Security Agreement as of June 28, 2005 granting to Hudson a security interest in all of the membership interests in the Project Owner to secure the repayment of the Mezzanine Loan.

13. On June 29, 2005, a Financing Statement was recorded with the Delaware Department of State listing the Mezzanine Borrower as Debtor and Hudson as Secured Party, attaching thereto a description of collateral (the "Pledged Equity") which described as the collateral the 100% membership interests in the Project Owner.

14. On August 23, 2006, a UCC-3 Financing Statement Amendment was filed with the Delaware Department of State indicating that the security interest in the Pledged Equity was assigned by Hudson to HRC Domestic. Both Hudson and HRC Domestic were listed as having identical mailing addresses at 381 Park Avenue South, Suite 428, New York, New York 10016. At no time did any of the Plaintiffs receive notice of this purported assignment of security interest.

15. On June 28, 2005 (the same date as the Mezzanine Loan was made to the Mezzanine Borrower), the Project Owner entered into a Loan and Security Agreement, a Mortgage and Fixture Filing and other related documents (including an assignment of rents and leases) with Fremont Investment & Loan, a California industrial bank (hereafter referred to as "Fremont") in connection with a loan in the amount of $69,750,000 made by Fremont to the

Project Owner. Said loan was to partially finance the acquisition of the Condo Project, which included certain real and personal property located in Orange County, Florida, more particularly described on Exhibit A to the Loan and Security Agreement.

16. In connection with the loan made by Fremont to the Project Owner, on June 28, 2005, Avila and Kaplan entered into a "Guaranty" in favor of Fremont.

17. As a result of the transactions that took place on June 28, 2005, Hudson was granted a security interest in all of the membership interests of the Project Owner, the owner of the real and personal property of the Condo Project that was subject to the mortgage in favor of Fremont. In summary, Fremont held a first mortgage on the Condo Project, and Hudson held a security interest in the ownership interests in the owner of the Condo Project.

18. Pursuant to the terms of the Secured Promissory Note between Millenia and Fremont, the loan matured on January 1, 2007.

19. As early as the summer of 2005, sales of completed units in the Condo Project did not meet projections. In large part, this was due to adverse publicity involving the Condo Project surrounding the abduction of a condo purchaser, which abduction remains unsolved. In order to assist with the cash flow difficulties, the principals of Millenia provided additional capital to the project on July 26, 2005, August 23, 2005, December 23, 2005, March 14, 2006, during the period from June 16, 2006 through July 11, 2006, September 21, 2006, December 15, 2006, February 9, 2007 and February 21, 2007. The cumulative amount of additional capital advanced by the principals of Millenia exceeded $5 million. The principals of Millenia were under no legal or other obligation to make the capital contributions at the respective times, but did so in order to demonstrate to Fremont and Hudson their good faith with respect to the ongoing Condo Project.

20. During January 2007 and/or early February 2007, representatives of Hudson advised the Mezzanine Borrower and the Guarantors that Hudson deemed the Mezzanine Borrower to be in default of the Mezzanine Loan Agreement, and threatened to take action against all parties, including the Guarantors, as a result of said alleged default.

21. Without in any way acknowledging the validity or correctness of the allegations made by Hudson, on February 8, 2007, the Mezzanine Borrower, in accordance with the provisions of Article 9 of the Uniform Commercial Code as applicable in Florida and New York, voluntarily surrendered to Hudson all of the Pledged Equity which constituted all the collateral described in the Pledge and Security Agreement (the ownership interests in the Project Owner, which owned the Condo Project subject to the Fremont mortgage).

22. As part of the documents that were executed between the Mezzanine Borrower and Hudson on June 28, 2005, to further support the Pledge and Security Agreement, the Mezzanine Borrower and the Project Owner entered into an Irrevocable Proxy Agreement and an Assignment (in blank) with Millenia granting to Hudson an irrevocable proxy with respect to the Pledged Equity, with the Pledged Equity being 100% of the membership interests of the Project Owner. Such irrevocable proxy was granted to Hudson, at the request of Hudson, so that in the event of a claimed default by Hudson as against the Mezzanine Borrower, Hudson could act, without the grant of further authority, in accordance with the provisions of Article 9 of the Uniform Commercial Code upon taking possession of the collateral which was the Pledged Equity. As a result, on and after February 8, 2007, Hudson was in possession, as secured creditor, of 100% of the membership interests of the Project Owner.

23. At no time prior to or subsequent to the voluntary surrender of the collateral by the Mezzanine Borrower to Hudson did Hudson or its counsel advise the Guarantors or the

Mezzanine Borrower that the security interest in the membership interests of Millenia had been transferred and assigned to HRC Domestic. Nevertheless, the voluntary surrender of the collateral by the Mezzanine Borrower to Hudson, if necessary, constituted also a voluntary surrender to HRC Domestic, an apparent affiliate of Hudson.

24. From and after February 8, 2007, representatives of and counsel for the Project Owner, Millenia and the Guarantors attempted to negotiate with Fremont to receive instructions from Fremont as to how the Condo Project subject to the mortgage and security interest in favor of Fremont should be managed, given the matured status of the loan. Representatives of Fremont declined to provide advice, consent, instructions or any assistance to Millenia and the Guarantors in connection with the operation and management of the Condo Project, claiming, in part, that Fremont was in negotiations with Hudson, and, therefore, could not and would not provide advice, assistance and/or consent to issues involving the management of the Condo Project.

25. As of the voluntary surrender, the Condo Project located in Orlando, Florida consisted of 251 unsold condominium units and 200 previously sold and closed condominium units. The Project Owner had entered into agreements with a management entity and a sales entity with respect to the respective management of the Condo Project, the management of the homeowners' association and the sale of condominium units. The Project Owner, as owner, was required to reimburse the management company for any shortfall in managing and operating the Condo Project. As of April 1, 2007, the average monthly budget for expenses for the operation of the Condo Project was $140,000.00.

26. On March 13, 2007, the Project Owner received a letter jointly executed by Fremont and HRC REIT advising the Project Owner that HRC REIT had purchased all of

Fremont's right, title and interest in and to the mortgage loan between Fremont and Millenia. The Project Owner was instructed that Fremont would have no continuing right or claim in connection with the mortgage loan.

27. On March 13, 2007, the Guarantors received a letter from HRC REIT advising the Guarantors that HRC REIT had acquired from Fremont all of Fremont's interest in the mortgage loan to Millenia. Additionally, HRC REIT claimed that the loan maturity on January 1, 2007 constituted an event of default with respect to the mortgage loan, and made demand upon Millenia (as Borrower) and Avila and Kaplan (as Guarantors) for full payment of the outstanding loan obligations. In so doing, the HRC REIT was making a demand to the Project Owner for payment notwithstanding the fact that the ownership interests of the Project Owner were held as collateral in possession of Hudson and/or Hudson Domestic. Thus, HRC REIT was making a demand for payment to itself or an affiliate.

28. As a result of HRC REIT's acquisition of the Fremont mortgage loan, as of the filing of the Complaint the following was the status of the various loans and parties:

    a. The Mezzanine Borrower owned 100% of the ownership interests of the Project Owner, the owner of the Condo Project.

    b. Hudson and/or HRC Domestic held, as secured creditor, based upon the voluntary surrender of collateral, all of the ownership interests of the Project Owner, the owner of the Condo Project.

    c. HRC REIT held the note evidencing the Fremont loan to the Project Owner, the documents issued in connection with that loan and the security interest in the Condo Project owned by the Project Owner. As set forth below in more detail, as a result of the grant

and delivery of a Deed in Lieu of Foreclosure to an entity affiliated with the Defendants, an affiliate of the Defendants held title to and owns the Condo Project.

        d.      As a result, Hudson-related entities had possession and control of all of the equity ownership interests of the Project Owner as mortgagor of the Condo Project, with the mortgage against the Project Owner being held by another affiliate of Hudson and the ownership of the Condo Project held by another Hudson affiliate. As a further result, Hudson-controlled entities were effectively owners or in control of both the mortgagor and the mortgagee.

29.     Notwithstanding the provisions of Article 9 of the Uniform Commercial Code, Hudson and/or HRC Domestic failed to take any action to liquidate or sell the collateral surrendered to it on February 8, 2007.

30.     Prior to the filing of the Complaint, the management company employed by the Project Owner to manage and operate the Condo Project sought advice from both Fremont and Hudson as to significant issues involving the ongoing management of the Condo Project. Since the management company was made aware of the claimed defaults of the Project Owner and the Mezzanine Borrower, the management company was instructed by the Project Owner to seek advice and instructions from Fremont and Hudson concerning the ongoing management and operations of the Condo Project.

31.     Some of the issues which then required immediate attention were the following:

        a.      On behalf of the Project Owner, the management company was required to obtain renewal hazard insurance upon the Condo Project. The management company, on behalf of the Project Owner, obtained quotations for a new policy which would have been less expensive than the then current policy. The management company and the Project Owner sought authority from Hudson to cancel the existing policy and purchase a less expensive replacement.

Notwithstanding the urgency of the situation, both Fremont and Hudson failed and refused to give any advice or instructions to the management company on behalf of the Project Owner. Since the Project Owner was required to obtain the consent of the mortgage lender for such actions, neither the Project Owner nor the management company could do anything without the consent of the Hudson Entities.[1]

        b.      The sales agent employed by the Project Owner received indications from prospective bulk purchasers of condominium units that such prospective bulk purchasers would be interested in purchasing groups of unsold condominium units. Since such sales would be out of the ordinary course of business, and may be for a price below the minimum permitted by the Hudson loan documents, the Project Owner sought Hudson's consent and acquiescence with respect to the consideration of such bulk sales. Such sales would benefit the Project Owner, the Plaintiffs and, presumably, the Hudson Entities. Despite repeated requests, the Hudson Entities failed to respond to the Project Owner, and the bulk sales were lost.

        c.      Ordinary operating expenses of the Condo Project remain unpaid. At one point, the electricity was disconnected to the condominium clubhouse. Routine maintenance was not being done, and all necessary health and safety requirements were not being met. The Hudson Entities failed and refused to provide the necessary direction and/or payment for the proper preservation, maintenance and management of the Condo Project.

    32.    The Project Owner received notice from the management company for the project that the Project Owner was in default with respect to its obligations under the management agreements, in that the Project Owner failed to fund the ongoing expenses for the operation of the Condo Project.

---

[1] Henceforth, the Counter-Plaintiffs will refer to the Hudson Entities collectively. When receiving communications, the Mezzanine Borrower and the Counter-Plaintiffs do not receive information from the Hudson entities as to which entity is the originator of the communication.

33. Since the voluntary surrender of the Pledged Equity to Hudson on February 8, 2007, the Guarantors have repeatedly sought acknowledgment by Hudson that it will assume its responsibility as a secured creditor under Article 9 of the Uniform Commercial Code. Once collateral has been voluntarily surrendered to a secured creditor, such secured creditor has not only a fiduciary duty to preserve and protect the collateral, but also has a requirement under New York law to act in a manner that is consistent with good faith and fair dealing. Hudson and/or Hudson Domestic have refused to substantively respond.

34. As a result of the above, while principals of the Project Owner still remained as titular officers of the Project Owner, they did not receive any direction or control from Hudson as to what should or should not be done with respect to the Condo Project. As 200 owners occupied units in the Condo Project, the failure of the Hudson-related entities to manage the property has had a significant impact on the quality of life of the residents.

35. On March 24, 2007, counsel for Millenia advised counsel for HRC that Millenia was prepared to give to HRC a Deed in Lieu of Foreclosure, rather than causing or requiring a foreclosure action to be filed. However, on Sunday, March 25, 2007, HRC notified Millenia that unless all of the documents attendant to the delivery of a Deed in Lieu of Foreclosure as well as the Deed in Lieu of Foreclosure were delivered and recorded by the close of business, Monday, March 26, 2007, the offer to accept a Deed in Lieu of Foreclosure would be withdrawn, and a foreclosure action would be filed. The deadline of the close of business on March 26 set by HRC was truly artificial.

36. Subsequently, the artificial deadline of March 26, 2007 set by HRC was extended until 4 p.m. March 27, 2007.

37. Despite the fact that counsel for the parties were diligently working towards executing the documents necessary to effect the Deed in Lieu of Foreclosure, HRC stuck by its artificial deadline, and a foreclosure action was (unnecessarily) filed late in the day on March 27, 2007 in the Circuit Court for Orange County, Florida..

38. On April 13, 2007, the Project Owner delivered to counsel for HRC REIT a special warranty deed in lieu of foreclosure listing HRC Luxury Condominiums, LLC as grantee. On the same day, counsel for HRC REIT accepted the deed in lieu of foreclosure. This effectively mooted the foreclosure count to the Complaint filed in Orange County, Florida. Subsequently, said foreclosure count was dismissed as to the Project Owner.

## COUNT I

### (Declaratory Relief
### Against Hudson And Hudson Domestic)

39. All of the allegations contained in paragraphs 1 through 38 of this Counterclaim are incorporated by reference in this Count I.

40. The Mezzanine Loan Agreement and the Mezzanine Note which evidence the obligation to pay the Mezzanine Loan are non-recourse obligations.

41. The Guarantee Agreement contains a limited-in-scope guarantee in favor of Hudson. As set forth in the Guarantee Agreement, the limited scope of the Guarantee is contained in section 1.2 of the Guarantee Agreement which describes the "Guaranteed Obligations."

42. Notwithstanding the extremely limited scope of the Guaranteed Obligations as contained in the Guarantee Agreement, and without appropriate cause or justification, Hudson made a demand upon the Guarantors for the Guarantors to pay (a) all of the obligations of the Mezzanine Borrower to taxing authorities, interest, condominium association fees and

obligations due by the Mezzanine Borrower to others, and (b) other obligations, including, but not limited to, the Mezzanine Loan.

43.     On February 9, 2007, counsel for Hudson delivered a notice to the Guarantors of a claimed default with respect to the Mezzanine Loan and a claimed acceleration and obligation by the Guarantors to pay to Hudson "full and immediate payment of the outstanding loan obligations." Said communication stated that counsel represents "Hudson Realty Capital Fund III LP in connection with the referenced loan." The Counter-Plaintiffs assume that said notice constitutes a representation that Hudson holds the Note and security interest for said loan. However, as set forth above, HRC Domestic is listed as the assignee of the security interest with respect to said loan as of August 23, 2006. As such, Hudson's claim of default and acceleration of the indebtedness of the Note and the claim on the Hudson Guaranty may have been a nullity.

44.     The Guarantee Agreement, drafted exclusively by counsel and agents for Hudson, is specifically limited in scope, and does not obligate the Guarantors to pay to Hudson any of the debts now being claimed by Hudson.

45.     An actual controversy exists as to whether the Guarantors are obligated to pay anything to Hudson in connection with the Guarantee Agreement.

46.     The Counter-Plaintiffs assert that it is necessary for this Court to grant a declaratory judgment in favor of the Counter-Plaintiffs to the end and effect that none of them have any obligation to Hudson under the terms of the Guarantee Agreement.

47.     Neither the Mezzanine Borrower nor the Guarantors nor the Project Owner have caused or suffered any of the actions to have occurred that would constitute an obligation for a "Guaranteed Obligation" under section 1.2 of the Guarantee Agreement. Notwithstanding the

absence of the creation or existence of a Guaranteed Obligation as defined in the Guarantee Agreement, Hudson is inappropriately making demand upon the Guarantors.

WHEREFORE Millenia Luxury Condominiums (Florida), LLC, Eduardo Avila and Jack Kaplan pray this Court to enter a declaratory judgment in their favor declaring that they have no obligation or liability to Hudson Realty Capital Fund III LP or HRC Fund III Pooling Domestic LLC by virtue of the Guarantee Agreement between them.

## COUNT II

### (Declaratory Relief Against HRC REIT)

48.   All of the allegations contained in paragraphs 1 through 38 of this Amended Complaint are incorporated by reference in this Count II.

49.   Notwithstanding the extremely limited scope of the Guaranty given by Avila and Kaplan to Fremont, which is now purportedly held by HRC REIT, HRC REIT has made a demand upon Avila and Kaplan "for full and immediate payment of the outstanding loan obligations."

50.   The Guaranty given to Fremont, and now purportedly held by HRC REIT, does not obligate Avila and Kaplan to pay HRC REIT any of the debts now being claimed by HRC REIT.

51.   An actual controversy exists within this jurisdiction as to whether Avila and Kaplan are obligated to pay anything to HRC REIT in connection with the Guaranty given to Fremont.

52.   Avila and Kaplan assert that it is appropriate for this Court to grant declaratory judgment in favor of Avila and Kaplan to the end and effect that neither of them have any obligation to HRC REIT (or any of the Hudson Entities) under the terms of the Guaranty granted to Fremont.

WHEREFORE Eduardo Avila and Jack Kaplan pray this Court to enter a declaratory judgment in their favor declaring that they have no obligation or liability to HRC Fund III Pooling REIT, LLC by virtue of the Guaranty granted to Fremont Investment & Loan.

### COUNT III

**(Damages Against the Hudson Entities)**

53. All of the allegations contained in paragraphs 1 through 38 of this Amended Complaint are incorporated by reference in this Count III.

54. All three of the Hudson Entities are secured creditors under the provisions of Article 9 of the Uniform Commercial Code. Hudson is a secured creditor by virtue of the security interest granted to it by the Mezzanine Lender on or about June 29, 2005. HRC Domestic is a secured creditor by virtue of the purported assignment to it from Hudson filed with the Delaware Department of State on August 23, 2006. HRC REIT is a secured creditor as a result of its claimed acquisition of the loan, mortgage and security interest granted to Fremont. In addition, an affiliate of the Hudson Entities is the grantee of the Deed in Lieu of Foreclosure for the Condo Project.

55. Pursuant to Article 1 of the Uniform Commercial Code, as applicable in New York, the Hudson Entities, as secured creditors, have an obligation of good faith and fair dealing in their respective dealings with the Counter-Plaintiffs.

56. Additionally, Hudson and HRC Domestic have duties as secured parties having possession or control of collateral in accordance with New York law.

57. The Uniform Commercial Code as applicable in New York provides, among other things, that when a secured party is in possession of collateral, a secured party is required to use reasonable care in the preservation of the collateral in the secured party's possession.

58. Hudson and/or Hudson Domestic, as the collateral security holders of 100% of the ownership interests of the Project Owner, are required to take those steps necessary to preserve the value of the equity interest owned by the Mezzanine Lender in the Project Owner and the Condo Project. This, Hudson and Hudson Domestic have failed and refused to do.

59. The machinations of the Hudson Entities, which have consolidated in their hands control of the ownership interests in both the Mezzanine Borrower and the Project Owner, along with ownership of the Condo Project, have created a barrier which prevents the Counter-Plaintiffs from taking those actions which could preserve, protect and maximize the value of the Project Owner's assets and thereby accrue to the benefit of the Hudson Entities.

60. Instead, the confrontational and threatening statements which Hudson's representatives directed to Avila and Kaplan and/or their counsel on or about February 7, 2007, and during the week of March 12, 2007 and thereafter, evidence a conspiracy among the Hudson Entities to made it impossible for the Counter-Plaintiffs to take those actions which could maximize the return to those entities from a sale or disposition of the collateral held by them. Rather, the Hudson Entities seem intent on forcing Avila and Kaplan to capitulate to their unreasonable demands to make payment under the two Guarantees even though they are under no obligation to do so. Those actions represent a lack of good faith and fair dealing on the part of the Hudson Entities.

61. Hudson entered into a contract with the Counter-Plaintiffs by virtue of the Guaranty Agreement.

62. By virtue of the records of the Delaware Department of State, Hudson Domestic, as assignee and/or successor to Hudson, is now in privity of contract with the Counter-Plaintiffs.

63. Avila and Kaplan entered into a contract by virtue of the Guaranty granted to Fremont. HRC REIT, as assignee of Fremont, is now in privity of contract with Avila and Kaplan as Guarantors and the Project Owner as mortgagor.

64. By virtue of each of the contracts and agreements which constitute, among other things, security agreements within the meaning of Article 9 of the Uniform Commercial Code, the Hudson Entities are obligated to act in a commercially reasonable manner, and to act in a manner consistent with good faith and fair dealing.

65. The Hudson Entities have failed to act in a commercially reasonable manner, and the threatening and confrontational actions of representatives of the Hudson Entities, effected in order to force the Counter-Plaintiffs and the Project Owner into capitulating to the Hudson Entities' unreasonable demands, constitute acts that are inconsistent with standards of good faith and fair dealing.

66. The Counter-Plaintiffs have been damaged as a result of the actions of the Hudson Entities in breaching their respective agreements with the Counter-Plaintiffs. Such damages include, but are not limited to:

a. Monies that have had to be advanced by the Counter-Plaintiffs in order to meet the ongoing obligations of the Project Owner and its management entities which would otherwise be the obligation of one or more of the Hudson Entities.

b. Loss of prospective sales and rentals of units in the Condo Project which would inure to the benefit of all parties and reduce either the outstanding loan balances and/or operational expenses;

    c. Exposing the Counter-Plaintiffs to actions by others for the failure of the Project Owner and the Project Owner's management entities into breaching terms and conditions of agreements with third parties relating to the Condo Project; and

    d. The attorneys' fees and expenses that have been incurred by the Counter-Plaintiffs as a result of the inappropriate actions of the Hudson Entities.

  67. The actions of the Hudson Entities' representatives have evidenced a willful and wanton disregard of the rights of the Counter-Plaintiffs, and have further evidenced malice on the part of the representatives of the Hudson Entities directed toward the Counter-Plaintiffs.

  WHEREFORE, Millenia Luxury Condominiums (Florida) LLC, Eduardo Avila and Jack Kaplan demand judgment for damages against Hudson Realty Capital Fund III LP, HRC Fund III Pooling Domestic LLC and HRC Fund III Pooling REIT LLC as may be proven to the Court.

<u>JURY DEMAND</u>

  Pursuant to Rule 47 of the Federal Rules of Civil Procedure, the Counter-Plaintiffs request a civil jury of at least six (6) persons on all issues so triable.

Dated:  January 8, 2008.

        ADORNO & YOSS LLP
        Attorneys for the Counter-Plaintiffs


        By: /s/Stephen C. Hunt
           Stephen C. Hunt (SH 6603)
           350 East Las Olas Boulevard, Suite 1700
           Fort Lauderdale, Florida 33301-4217
           Phone:  (954) 763-1200
           Fax:  (954) 766-7800
           Email: shunt@adorno.com

        And

        1040 Avenue of the Americas, Suite 1101
        New York, New York 10018
        Phone: (212) 809-5700